**MILTLAND RALEIGH–DURHAM, Miltland Sacramento and Miltland Chicago–Santa Fe, Plaintiffs,**

v.

**Michael H. MYERS, Myers Miltland Raleigh–Durham Limited Partnership, Myers Miltland Sacramento Limited Partnership, Chicago–Santa Fe Partnership and Myers Financial Group, Defendants.**

No. 89 Civ. 1530 (CBM).

United States District Court,
S.D. New York.

Aug. 26, 1992.

1026

Boyle, Vogeler & Haimes by Michael J. Levin, David S. Hoffner, New York City, for plaintiffs.

Merkin & Hemme by Donald Merkin, Jeanne Taber, La Jolla, CA, for defendants.

OPINION

MOTLEY, District Judge.

## I. Introduction

A. Procedural history.

Plaintiffs, as limited partners, brought suit against three land investment limited partnerships and against the general partners, defendant Michael H. Myers ("Myers") and defendant Myers Financial Group, Inc. ("Myers Financial"). The case was tried before the court on November 4–15, 1991.

The parties submitted proposed findings of fact and conclusions of law keyed to the record on or about January 15, 1992. Reply papers were submitted on February 10, 1992. With its reply, defendants made three motions to strike evidence.

On February 24, 1992, plaintiffs notified the court by letter that Myers had filed a petition under Chapter 7 of the Bankruptcy Code on February 19, 1992 in the United States Bankruptcy Court for the Central District of California. Because of the automatic stay provisions of the Bankruptcy Code, 11 U.S.C. § 362(a)(1), which became effective upon the filing of Myers' bankruptcy petition, plaintiffs were stayed from taking further steps prosecuting their case against Myers until the automatic stay was modified.

On May 21, 1992, plaintiffs informed the court by letter that they had obtained from the Bankruptcy Court an Order modifying the automatic stay to allow this action to proceed to judgment. Plaintiffs attached a copy of the Bankruptcy Court's Order to their letter, which the court filed in this action. On May 28, 1992, plaintiffs responded to defendants' motions to strike evidence.

### B. Plaintiffs' claims.

This case arises out of an extensive fraud on plaintiffs by Myers. Over a two year period, Myers induced plaintiffs to invest in three limited partnerships. In each case, either Myers or his wholly-owned corporation, Myers Financial, were the general partners. Contrary to his statements to plaintiffs that he would not obtain any benefit for himself at the inception of the transactions—representations which Myers intended not to fulfil—Myers secretly diverted substantial sums from the monies obtained from plaintiffs for his own purposes.

This repetitive fraud—conceived in 1984, implemented in 1985–1986 and subsequently concealed by Myers—forms the basis of plaintiffs' fraud claims against Myers and Myers Financial: (1) civil violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq.* ("RICO"); (2) securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j, and Rule 10b–5 thereunder; (3) common law fraud; and (4) breach of fiduciary duty. In their Amended Complaint, plaintiffs also allege breach of contract against Myers.

By way of relief, plaintiffs seek the removal of Myers and Myers Financial as general partners of the limited partnerships, accountings by defendants, equitable liens on Myers' and Myers Financial's interests in the limited partnerships, rescission of the purchase of the land purchased by defendant Myers Miltland Raleigh Durham Limited Partnership ("the Durham Limited Partnership"), and constructive trusts or liens on the limited partnerships' properties. Plaintiffs also seek approximately $1 million in compensatory damages (trebled under RICO). Plaintiffs, however, would have to elect between recission and damages with respect to their breach of contract claim regarding the Durham Limited Partnership. On their breach of fiduciary duty and common law fraud claims, plaintiffs seek punitive damages of at least $5 million, a permanent injunction enjoining defendants from committing further wrongful acts, interest and the costs of this action, including attorney's fees.

The court finds that plaintiffs' have prevailed on each of their legal and equitable claims and are entitled to all the relief requested, except where a damage claim would be duplicative of other damage claims.

## II. Findings of Fact

After hearing the evidence and weighing the testimony and exhibits received in evidence, as well as the credibility of the witnesses, the court makes the following findings of fact:

### A. The Parties.

Plaintiff Miltland Raleigh–Durham (50 partners), plaintiff Miltland Sacramento (50 partners) and plaintiff Miltland Chicago–Santa Fe (39 partners) are a general partnerships under New York law. Each has its principal place of business at 1 Chase Manhattan Plaza, New York, N.Y., 10005, and is comprised of citizens of New York, New Jersey, Connecticut and California. (Pretrial Order, Undisputed Facts, ¶ 1–3).

Defendant Myers was at the time this action was commenced a citizen of Arizona. For a number of years prior to the events giving rise to plaintiffs' claims, and at all material times, Myers, individually and through legal entities, was a promoter and syndicator of real estate investments throughout the United States. (Pretrial Order, Undisputed Facts, ¶ 4).

Defendant Myers Financial is a Delaware corporation which had its principal place of business at the time this action was commenced in Tucson, Arizona, and at all relevant times was controlled by Myers. (Pretrial Order, Undisputed Facts ¶ 8). Myers

and Myers Financial are referred to as the "Myers Defendants."

The Durham Limited Partnership and defendant Myers Miltland Sacramento Limited Partnership (the "Sacramento Limited Partnership") are Texas limited partnerships. Plaintiff Miltland Raleigh–Durham is the sole limited partner in the Durham Limited Partnership and plaintiff Miltland Sacramento is the sole limited partner in the Sacramento Limited Partnership. The sole general partner of both the Durham Limited Partnership and the Sacramento Limited Partnership is Myers. (Pretrial Order, Undisputed Facts, ¶ 5–6).

Defendant Chicago–Santa Fe Partnership (the "Chicago Limited Partnership") is an Illinois limited partnership. Plaintiff Miltland Chicago–Santa Fe is one of two limited partners in the partnership. The Chicago Limited Partnership's sole general partner is Myers Financial. (Pretrial Order, Undisputed Facts, ¶ 7).

### B. Defendant Michael H. Myers.

Myers has been involved in the real estate business since 1962, when he became a salesman for the David Zone Company specializing in commercial income-producing property. (Myers, Tr. 633–34). In 1965, Myers formed the Myers Company in Seattle (Myers, Tr. 634), which he subsequently used as a vehicle for real estate investments. By 1975, the Myers Company had acquired, on behalf of its clients, approximately 200 pieces of property in three states. (Myers, Tr. 635).

In 1977, Myers founded the Talisman Corporation ("Talisman"), which subsequently became the Myers Capital Corporation ("Myers Capital"). (Myers, Tr. 636). Myers was the sole owner of Talisman and Myers Capital. (Myers, Tr. 503; Walker, Tr. 183). Until 1977, Myers functioned as a real estate broker and manager for real estate properties. (Myers, Tr. 636). Talisman was formed to become the managing general partner for private land syndications to be sponsored by Myers which would ultimately be sold through the broker-dealer National Association of Securities Dealers ("NASD") community. (Myers, Tr. 636).

In the course of the business of Talisman, and its successor, Myers Capital, Myers acquired raw land in his name which he transferred to limited partnerships, of which Talisman or Myers Capital was the general partner. (Myers, Tr. 636–39). The limited partnership interests were sold to public investors. (Myers, Tr. 637–39). After formation of the limited partnerships, the acquisition of the land from Myers and the syndication of the limited partnership interests, the limited partnerships were administered and managed by Talisman or Myers Capital. (Myers, Tr. 638–39). From November 1977 through July 1980, Talisman syndicated approximately six limited partnerships. (Myers, Tr. 639). In 1981, Talisman syndicated an additional fourteen or fifteen partnerships. (Myers, Tr. 640).

In 1982, with the growth of Myers' real estate business, Myers restructured his entities. He formed The Myers Group, which became the sole owner of the Myers Company and Myers Capital. (Myers, Tr. 640; Ashton–Blair, Tr. 432). Myers was the sole owner and president of The Myers Group. (Myers, Tr. 503; Ashton–Blair, Tr. 432). The Myers Company functioned as a real estate broker for the purchase and resale of the land purchased for the Myers sponsored limited partnerships. (Myers, Tr. 641). The Myers Company also had responsibility for demographic research and analysis in land management. (Myers, Tr. 641).

Also in 1982, Myers formed a captive broker-dealer, Syndex Securities Corporation ("Syndex"), which was registered with the NASD as a broker-dealer in securities. (Myers, Tr. 642). Syndex sold the limited partnership units in the limited partnerships sponsored by Myers Capital. (Myers, Tr. 642).

By 1984, Myers-controlled entities had syndicated roughly 42 limited partnerships which had purchased raw land throughout the United States. (Myers, Tr. 645). In 1985, Myers-controlled entities syndicated to public investors an additional 60 limited partnerships which had been formed to purchase raw land. (Myers, Tr. 645; Stark, Tr. 21). By 1985, Myers had been

involved in the acquisition of, or had acquired, approximately 250 to 300 parcels of raw land, at an aggregate acquisition price of approximately $350,000,000 to $400,000,-000. (Myers, Tr. 646).

## C. Myers' Problems with Kent Land.

One of the limited partnerships which Myers sponsored in the early 1980's was Kent Land Investors Limited Partnership ("Kent Land"), which purchased an approximately 40 acre parcel of raw land in Kent, Washington on March 3, 1981 (the "Kent Parcel). (Plf.Ex. 135, 136; Def.Ex. EEE). The purchase price for the 40 acres was $1,600,000, or $0.94 per square foot (Plf.Ex. 135, 136; Volchok, Tr. 366–67). The Kent Parcel was subject to a mortgage of $1,250,000. (Def.Ex. EEE, at 46). Talisman and Myers were Kent Land's general partners. (Def.Ex. EEE, at 23).

Myers was the major shareholder and director of Talisman. (Def.Ex. EEE, at 18). The two general partners, Talisman and Myers, personally received annual administration and management fees of $32,000 and would receive a 35% "Subordinated Incentive Fee" when the Kent Parcel was sold providing them with 35% of the sales price of the Kent Parcel after the return of the limited partners' capital. (Def.Ex. EEE, at 8–9).

At the time of the purchase of the Kent Parcel, the 40 acres were zoned for "manufacturing agricultural" which allowed for agriculturally related industrial use. (Volchok, Tr. 337–38). When the Kent Land limited partners were being solicited by Talisman and Myers they were advised in the prospectus that the General Partners believed that the Kent Parcel would be rezoned "for industrial use." (Def.Ex. EEE, at 25). The Kent Land investors were also advised in the prospectus that the Kent Parcel had been appraised at $2,000,000. (Def. EEE, at 26).

Shortly after Kent Land purchased the Kent Parcel it was rezoned, not for industrial use, but for agricultural use only. (Volchok, Tr. 338–39). Moreover, the Kent Parcel was 4–5 feet below flood level and flooded once or twice a year. (Volchok, Tr. 318–24, Plf.Ex. 232). In order to develop the Kent Parcel, 3–4 feet of fill would be required for all or a substantial part of the 40 acres, at a cost of over $1,200,000. (Volchok, Tr. 334–36). The combination of the zoning of the Kent Parcel to agricultural and the flooding problem meant that the property could only be used for raising crops or raising cattle, and the market value of the Kent Parcel plummeted to 6 to 7 cents per square foot by early 1985. (Volchok, Tr. 343–44; 359–60). At that price, the Kent Parcel had a value in early 1985 of approximately $105,000 to $122,000, which rendered the Kent Land Limited Partnership substantially insolvent because the Kent Parcel was subject to a $1,250,000 mortgage.

## D. Myers' Proposals to Milbank.

In 1984, Myers approached the law firm Milbank, Tweed, Hadley & McCloy ("Milbank") to perform legal work for him in connection with an initial public offering. (Myers, Tr. 643; Stark, Tr. 18–19). The proceeds of the offering, projected to be between $50,000,000 and $100,000,000, were to be used to provide capital for a new Myers-sponsored publicly owned partnership which would purchase raw land. (Stark, Tr. 19; Myers Tr. 643). The Milbank partner in charge of the work on the initial public offering was Richard A. Stark, who was a corporate lawyer experienced in the public offering of securities. (Stark, Tr. 10, 18). The proposed initial public offering never came to fruition and by late 1984, Milbank's work on the project had substantially ceased. (Stark, Tr. 19–20).

In the fall of 1984, Myers learned of the zoning problem with regard to the Kent Parcel. (Myers, Tr. 673). At that time, Myers learned that Myers Capital, under its president, Steven P. Walker, III ("Walker"), had sued the Kent City Council in an effort to obtain rezoning of the Kent Parcel from agricultural to commercial for the purpose of increasing its value. (Myers, Tr. 673).

By this time, the Kent Parcel had been held by Kent Land for over three years. (Plf.Ex. 135). Because it had been rezoned agricultural, the Kent Parcel was worth

less than the mortgage securing it. (Volchok, Tr. 343–44; Def.Ex. EEE, at 46). In order to meet the debt service on the Kent Parcel's mortgage, periodic capital calls had to be made on the partners and would remain necessary until the mortgage was paid or the property sold. (Plf.Ex. 135, at 3; Def.Ex. EEE, at 15).

In October 1984, Myers met another Milbank partner, Jonathan Blattmachr ("Blattmachr"), and requested Blattmachr to do trusts and estate work for him. (Blattmachr, Tr. 515). At the time, Myers advised Blattmachr that he was the largest dealer in the United States in syndicating raw land. (Blattmachr, Tr. 515).

At their initial meeting in October 1984, at Myers' home in Tucson, Myers told Blattmachr that he was unhappy with the private placement syndications which he had been sponsoring in which thirty to forty unrelated people would invest because brokerage commissions were too high and because communications with a number of unrelated investors had proven difficult. (Blattmachr, Tr. 516–17). Myers discussed with Blattmachr the idea that it would be easier for Myers to invest with a single wealthy individual or a group for which there would be a single representative, such as a group of lawyers. (Blattmachr, Tr. 517).

In late December 1984, approximately two months after Myers had met with Blattmachr in Tucson, Walker, who had left Myers' employ to go into business on his own, received a visit from another Myers associate, Peter W. Mudie ("Mudie"). (Walker, Tr. 170–71). Walker was attempting to purchase an approximately 53 acre tract of land in Durham, North Carolina (the "Durham Parcel") from Hal Pettigrew ("Pettigrew"), a Dallas real estate entrepreneur who had had prior dealings with Myers. (Walker, Tr. 164–70). Pettigrew, through a limited partnership which he controlled called Redwood Partners ("Redwood") (Pretrial Order, Undisputed Facts, ¶ 10), had just acquired the Durham Parcel for $673,000, paying $155,178 in cash and giving back a $523,000 purchase money mortgage. (Pettigrew, Tr. 256–62; Plf.Ex. 81, 94, 95, 96, 97, 99). Walker was attempting to buy the Durham Parcel from Redwood for $896,790 and had forwarded a partially executed contract to Pettigrew with the request that it be signed. (Walker, Tr. 164–70; Plf.Ex. 79, 80). Walker testified that Mudie told him to "drop the contract" to purchase the Durham Parcel and that if he did not do so he would anger Myers and that Myers would "disrupt" Walker's business if he pursued the Durham Parcel. (Walker, Tr. 170–73). Walker further testified that as a result of Mudie's statements, and Walker's fear that Myers would cause injury to his business if he continued in his efforts to buy the Durham Parcel, Walker abandoned his efforts to purchase the property. (Walker, Tr. 170–73).

In January 1985, Myers met with the executive committee of Myers Capital at Myers' offices in Dallas, at which time the Kent Land problem was discussed. (Myers, Tr. 675, 833–34). Myers testified that at that time he came up with the idea that a way of solving the Kent Land problem would be the granting of "a three year option with enough money to pay the underlying [mortgage] payments." (Myers, Tr. 835). Also in January 1985, Myers met Blattmachr in New York and told him "that he was considering approaching someone at Milbank Tweed to see whether any or all of the partners at [the] firm would have an interest in acquiring some land with him." (Blattmachr, Tr. 516).

At about the time of his meeting with Blattmachr in January 1985, Myers telephoned Stark and made a detailed proposal that Milbank partners invest with him. (Stark, Tr. 23). Myers told Stark that he would select the land for the Milbank partners, which Myers represented to be his particular skill, and that he would form and manage a limited partnership in which the Milbank partners would become limited partners. (Stark, Tr. 23). Myers, as general partner of each of the limited partnerships, was to have control over the business affairs of the limited partnerships. (Stark, Tr. 23). The limited partners were to rely entirely upon the efforts of Myers, as general partner, to bring about a return on their investment. (Stark, Tr. 23–25).

Myers told Stark that there would be no up front charges or commissions for raising the money or purchasing the land, including no broker's commission paid to Myers for purchasing the land or preparing it for sale. (Stark, Tr. 23). Myers told Stark that his total compensation would be a share of the profits when the property was sold. (Stark, Tr. 23). Myers proposed that when the property was sold the limited partners would share in the profit first, to the extent of an annualized return of 20% on their original investment, and that after the limited partners had received their capital and the 20% annualized return, Myers would begin to share in the profits. (Stark, Tr. 23). Myers proposed that at that point he would receive a share of the profits up to the amount equal to the profit share that the Milbank limited partners had received (i.e. the 20% annualized return) and thereafter share 50–50 with the limited partners. (Stark, Tr. 24).

Myers told Stark that the Milbank partners would be doing him a "huge favor" if they would invest in the ventures with Myers because the ventures would become a "showcase for his marketing similar arrangements with other law firms and with accounting firms and similar organizations." (Stark, Tr. 24). In contrast to the raw land investments which Myers had previously sponsored, where the land had been purchased subject to mortgages, Myers claimed that a better price could be obtained for the land if it were purchased for cash. (Stark, Tr. 24). Myers also told Stark that it would be advantageous for him to deal with a limited number of people and that there would be no "real expense" to Myers in raising the money. (Stark, Tr. 24–25).

Myers also told Stark that one of the reasons he wished to take a back-end profit only would be to underscore his belief and confidence that he could find properties that would appreciate. (Stark, Tr. 25). He was therefore willing to enter into the venture and rely entirely on the back-end profit for his compensation. (Stark, Tr. 25). Myers told Stark, "if [the Milbank investors] did not make money, he did not make money." (Stark, Tr. 25).

Myers provided Stark with his proposal in their first telephone conversation, in late December 1984 or early January 1985, together with some of the advantages, which Myers elaborated on in several telephone conversations in January and early February 1985. (Stark, Tr. 25–26). In the first telephone conversation in which Myers proposed to Stark that Milbank partners provide capital for investments with him, Stark told Myers that Milbank could not be his counsel in the proposed transactions and that Myers would have to obtain separate counsel. (Stark, Tr. 28–29). Myers replied that he saw "no difficulty" and that he had "plenty of lawyers, both inside and outside" of his organization. (Stark, Tr. 29). At that time, the general counsel of Myers' organization was Rex Brown, III. (Stark, Tr. 29). Myers also had a real estate lawyer working for his organization, Michael Casey. (Stark, Tr. 29–30). In his testimony at trial, Myers did not contest any of the foregoing facts.

During the time that Myers was making his proposal to Stark, he met with Blattmachr in early February 1985 at the Carlyle Hotel in New York City and discussed his proposed investments with Milbank partners. (Blattmachr, Tr. 517–18). Myers repeated what he had told Stark: that there would be no fees at the inception of the investment for the finding of the land or arranging the deal and that his only compensation would be a share in the profits upon resale. (Blattmachr, Tr. 518–20, 546). Myers again stated that the Milbank partners would receive a 20% annualized preferred return, after which Myers would share in the profits 50–50. (Blattmachr, Tr. 519).

Myers told Blattmachr the proposed terms demonstrated that he was picking the "best property since he would receive no compensation without a profitable resale." (Blattmachr, Tr. 519–20). Blattmachr testified that "he [Myers] told me it was because he wanted those of us who would invest to be absolutely positive that he would be giving us the best property, because unless there was this profit he wouldn't make anything." (Blattmachr, Tr. 519). Myers' assistant, Scott Ashton–

Blair, testified that he and Myers discussed the terms of the ventures Myers was proposing to Milbank partners and that Myers had told Ashton–Blair that he would not take a commission on the ventures. (Ashton–Blair, Tr. 450–51). Ashton–Blair testified that Myers "specifically told me he would not take a commission." (Ashton–Blair, Tr. 450).

In late January or early February 1985, Myers suggested to Stark in a telephone conversation that Stark and John C. Nelson, a Milbank partner who specialized in real estate and who entertained reservations about the Milbank partners investing in raw land (Stark, Tr. 27–28), take a trip with Myers so that he could show Nelson and Stark the kinds of investments which Myers was making and they could meet some of Myers' employees. (Myers, Tr. 714–15). Myers told Stark that he believed that he could show Nelson enough about investing in raw land that he would be persuaded to go forward with Myers' investment proposals. (Stark, Tr. 28).

### E. Myers' Trip with Stark and Nelson to View Properties.

On February 26, 1985, Stark and Nelson flew from New York to Raleigh–Durham, North Carolina where they met with Myers the next morning. (Stark, Tr. 28, 30–31; Plf.Ex. 192). Myers met Stark and Nelson the morning of February 27, 1985 at the hotel where Stark and Nelson were staying. (Stark, Tr. 32). They were joined by Mudie. (Stark, Tr. 32). Mudie was one of several individuals who Myers used to "find" raw land for possible investment. (Ashton–Blair, Tr. 438). Typically, Mudie was compensated by a commission when land was purchased by Myers. (Myers, Tr. 734).

Myers and Mudie gave Stark the understanding that Mudie represented Myers in the Raleigh–Durham area. (Stark, Tr. 32–33). Myers and Mudie told Stark that Mudie found land to be purchased by raw land syndications organized by Myers. (Stark, Tr. 32). Myers also told Stark that Mudie had previously worked for Myers in Dallas and that Myers had moved Mudie to the Raleigh–Durham area to have representation there. (Stark, Tr. 33).

After Stark and Nelson met Myers and Mudie, the party toured the Raleigh–Durham area inspecting undeveloped tracts of land. (Stark, Tr. 33). Among the parcels seen was the Durham Parcel. (Stark, Tr. 34). Mudie and Myers told Stark and Nelson that a railroad right-of-way on the Parcel, running along the land's western boundary, would be abandoned and that a major thoroughfare was planned to go through the land. (Stark, Tr. 34–35).

As with Mudie, Pettigrew, the owner (through Redwood) of the Durham Parcel, had had prior business dealings with Myers. Myers-sponsored publicly owned limited partnerships had purchased two properties in Fort Worth, Texas from Pettigrew-sponsored entities the previous year, 1984. (Pettigrew, Tr. 237, 251; Myers, Tr. 690). In addition, Myers, through an entity known as the Snow Creek Trust, owned land in Raleigh–Durham with Pettigrew and Mudie which had been sold to them in June 1984 by Myers Capital and Myers Group Partners, also organized by Myers. (Myers, Tr. 682–90; Pettigrew, Tr. 222–23, 252–54; Plf.Ex. 108, 113, 114).

The Durham Parcel which was shown to Stark and Nelson by Myers and Mudie on February 27, 1985 had been acquired by Pettigrew, through Redwood, less than six months earlier for $673,000. (Plf.Ex. 81, 94, 95, 96, 97, 99). At the time Pettigrew and Redwood signed the contract to purchase the Durham property on August 30, 1984, Mudie paid the $5,000 earnest money deposit. (Plf.Ex. 99, 99A, 100, 101, 102). Mudie had also acted on behalf of Redwood in the purchase, signing an amendment to the purchase agreement on October 27, 1984. (Plf.Ex. 82). Mudie had told Walker two months earlier to "drop his contract" to acquire the Durham Parcel for $896,790 or incur Myers' anger. (Walker, Tr. 164–73). Mudie personally had a 25% equity interest in the Durham Parcel. (Pettigrew, Tr. 273–74; Plf.Ex. 99A, 100, 101, 102). Myers and Mudie did not disclose to Stark and Nelson the fact that Mudie had a 25% equity interest in the Durham Parcel. (Stark, Tr. 35). There is no evidence that either Myers or Mudie disclosed to plaintiffs that the owner of the Durham Parcel,

Pettigrew, was involved with Myers and Mudie in other ventures.

After Mudie and Myers had shown Stark and Nelson the Durham Parcel and other properties in the Raleigh–Durham area, the group continued on the inspection trip flying next to Atlanta, Georgia. (Stark, Tr. 36). There they were met by another Myers representative, boarded a helicopter and were shown various properties in the Atlanta area. (Stark, Tr. 36). After Atlanta, and still on February 27, 1985, the group again boarded Myers' jet and flew to Tampa, Florida, where they were met by Myers' local representative, boarded a helicopter and were again shown parcels of raw land. (Stark, Tr. 36–37)

On the evening of February 27, 1985, Nelson, Stark and Myers boarded Myers' jet again and flew to Dallas, arriving late in the evening. (Stark, Tr. 37). The next morning, Stark and Nelson were given a tour of the offices of the Myers Group and Myers Capital in Dallas where they met additional members of Myers' staff, including the lawyers, Brown and Casey. (Stark, Tr. 37–38).

After visiting Myers offices in Dallas, the group again boarded Myers' jet and flew to Sacramento, California, arriving later the same day, February 28. (Stark, Tr. 39). Upon arrival the group boarded another helicopter and were shown various pieces of land in the area by Myers. (Stark, Tr. 39). After the helicopter inspection, the group was taken to Myers' office in San Francisco where they met with Linda Koplowitz ("Koplowitz"), who, like Mudie, was a "finder" of raw land for Myers-sponsored ventures. (Stark, Tr. 40; Ashton–Blair, Tr. 438–40; 451). In discussing land with Stark and Nelson, Koplowitz singled out a particular parcel in the Sacramento area of approximately 64 acres (the "Sacramento Parcel") which she advised Stark was "in a great location" near other land owned by "important development owners." (Stark, Tr. 41).

By the end of the day on February 28, 1985, Nelson had been persuaded that Myers could "pick land and that the areas where the land would be purchased were sufficiently growth areas." (Stark, Tr. 42).

Stark and Nelson had come to the belief that the ventures Myers was proposing would be the type of investment which they could present to their partners at Milbank. (Stark, Tr. 42). At the end of the trip, Stark and Nelson indicated to Myers that they were favorably disposed to his proposals. (Stark, Tr. 42–43).

During the two day trip on February 27 and 28, 1985, Myers had shown Stark and Nelson approximately 20 properties in six cities as "potential investments." (Myers, Tr. 860). However, the only two parcels which Myers submitted to Stark and Nelson were the Durham Parcel and the Sacramento Parcel. (Myers, Tr. 862–63). The day after the trip, in a telephone conversation with Stark and Nelson, Myers "very strongly recommended" that the Milbank partners invest in the Durham and Sacramento Parcels. (Stark, Tr. 44). Stark and Nelson were persuaded by Myers that there were elements about each of the properties which would cause them to appreciate and that the suggested tracts would be good investments. (Stark, Tr. 44). In making that decision, Stark and Nelson believed the most influential factors were Myers' general expertise that "he had demonstrated to us on the trip, and the form of the transaction that he proposed wherein he would share only in the profit at the end, which demonstrated his confidence in the properties he would select." (Stark, Tr. 44). Stark and Nelson had come to the belief that they could depend on Myers to select the land which was to be subject to investment. (Stark, Tr. 44).

## F. The Durham Transaction.

During the week after the trip, between March 1–8, 1985, Myers had several telephone conversations with Stark in which Stark reiterated the decision he and Nelson had reached to recommend to the Milbank partners that they invest in the two pieces of property suggested by Myers. (Stark, Tr. 45). Stark testified that "[w]e talked with him several times during that week and told him that we wanted to participate in these two pieces of property." (Stark, Tr. 45).

Myers told Stark that he should be tying up the Durham Parcel "pretty quickly," but that he would need to make a deposit of $400,000 "to hold it for us." (Stark, Tr. 45). Myers pressed Stark on whether the Milbank partners were going to invest. (Stark, Tr. 45). Stark responded that he and Nelson were confident that they would participate. (Stark, Tr. 45).

About March 6, 1985, Stark received a telephone call from Chemical Bank of New York asking whether Milbank partners were conducting business with Myers and whether they were going to be involved the Durham Parcel. (Stark, Tr. 46). Stark replied that they were. (Stark, Tr. 46).

The next morning, March 7, 1985, Myers, Mudie, Pettigrew and a business associate of Pettigrew, Murray Hardisty ("Hardisty"), met in Myers' offices in Dallas. (Pettigrew, Tr. 275; Hardisty, Tr. 564–66). The purpose of the meeting was to sign a contract for the purchase of the Durham Parcel. (Hardisty, Tr. 567). At the meeting, Myers told Pettigrew that he wanted to buy the Durham Parcel but that he wanted Pettigrew to help him "fix a problem that [Myers] had in Kent, Washington." (Pettigrew, Tr. 276). Myers told Pettigrew that after the Kent Parcel had been purchased it had been rezoned to agricultural use. (Pettigrew, Tr. 277). "He [Myers] gave [Pettigrew] the impression that the deal was in trouble unless the problem got solved." (Pettigrew, Tr. 291). Myers told Pettigrew that he would buy the Durham Parcel for $1,430,000 on condition that an option was purchased on the Kent Parcel for $230,000 (the "Kent Land Option" or the "Option"). (Pettigrew, Tr. 277–78, 284–85).

Pettigrew agreed with Myers to purchase the Option. (Pettigrew, Tr. 277). As a result, several transactions took place on March 7, 1985. Myers signed a contract to purchase the Durham Parcel from Redwood for a purchase price of $1,430,000, with an earnest money deposit of $400,000. (Pettigrew, Tr. 275–76; Plf.Ex. 90). Myers arranged for the $400,000 earnest money deposit to be paid by having Chemical Bank transfer that amount by wire to Redwood's account and charged against Myers' line of credit. (Pettigrew, Tr. 275–76). Stark's

statements to Myers the previous week that he was "confident" that the Milbank partners would invest (Stark, Tr. 45) allowed Myers to make the $400,000 transfer—and incur the debit to his line of credit at Chemical Bank—with the assurance that the Milbank partners would be reimbursing him. Simultaneously, Pettigrew wrote a $230,000 check drawn on Redwood's account and payable to Hardisty, which Hardisty deposited into his account that day. (Pettigrew, Tr. 276, 282–84; Plf.Ex. 104). Hardisty then signed the Option agreement with Myers for a purchase price of $230,000 which he paid by delivering to Myers his check in that amount drawn on his account—the same account in which Hardisty had deposited the $230,000 check from Redwood. (Pettigrew, Tr. 276, 282–84; Hardisty, Tr. 573; Plf.Ex. 105, 106).

The Kent Land Option was for a term of three years, with an exercise price of $3,484,800. (Plf.Ex. 106). Myers set the Option exercise price. (Hardisty, Tr. 576–80). Myers also set the purchase price of the Option of $230,000. (Hardisty, Tr. 576–78). Myers chose the purchase price of the Kent Land Option as $230,000 by determining what was necessary to pay the debt service on the Kent Parcel mortgage. (Myers, Tr. 505–06). Hardisty testified that there were no negotiations as to the $230,000 purchase price of the Option or the $3,484,800 exercise price. (Hardisty, Tr. 576–79). Hardisty stated that he had no idea of the value of the Kent Parcel. (Hardisty, Tr. 577–80). The $230,000 purchase price was non-refundable and, under the terms of the Option signed by Hardisty, was put into an escrow and used to pay the debt service on the Kent Parcel mortgage for the three year term of the Option. (Myers, Tr. 505; Baxter, Tr. 186–99; Plf.Ex. 72, 73).

Pettigrew and Hardisty knew that the $230,000 used by Hardisty to purchase the Option on the Durham Parcel came from the $400,000 earnest money deposit which Myers had provided. Pettigrew testified that the $230,000 he paid to Hardisty came out of the $400,000 which Myers had transferred from Chemical. (Pettigrew, Tr. 276). Pettigrew was also aware that the

$230,000 was used by Hardisty to pay for the Kent Land Option. (Pettigrew, Tr. 276). Hardisty testified that he obtained the $230,000 from Pettigrew. (Hardisty, Tr. 573–74). Pettigrew testified that he knew, from Hardisty or Myers, that the $230,000 was going to be placed in escrow to pay the mortgage on the Kent Parcel. (Pettigrew, Tr. 308–09).

The Court finds that Myers knew that the $230,000 used by Hardisty to purchase the Kent Land Option came from the $400,000 Myers had wired to Redwood. David Sandell, an executive of Medina Holdings, Inc., an accounting and property management services company, testified that in January or early February 1988, Myers admitted to him that he had engaged in a transaction in North Carolina which could be construed as providing Myers with a brokerage commission which had been disguised as if it had been paid to another person. (Sandell, Tr. 423–24). Myers told Sandell that the other person, who Myers identified as Hardisty, had "gotten a commission ... which he had used to buy the [Kent Land] option". (Sandell, Tr. 423–24). Sandell also testified that Myers had led him to believe "that he, Myers, had earned the commission but that he had had the commission treated as though the other guy [Hardisty] was the broker and that [he had] earned the commission so that the other guy [Hardisty] would put the money into the Kent Land transaction." (Sandell, Tr. 423). Sandell further testified that Myers had admitted to him "that he was concerned about the disclosure ramifications to the investors of having sold the options under circumstances where he might be viewed as having provided the consideration for the option amount or had something to do with it." (Sandell, Tr. 424).

Myers denied receiving a commission on the Durham transaction or even receiving the $230,000 paid for the Kent Land Option. (Myers, Tr. 776). The Court finds that Myers' testimony is contrary to the facts and that Myers personally benefited from receipt of the $230,000. The testimonial and documentary evidence establishes that the Kent Land Limited Partnership— of which Myers was a general partner,

which Myers controlled and in which he had a substantial personal economic interest—received the $230,000 which had been paid for the Kent Land Option and that the $230,000 was used to pay the mortgage on the Kent Parcel for three years (Baxter, Tr. 186–99; Plf.Ex. 72, 73; Pettigrew, Tr. 285–86; Plf.Ex. 106), as Myers admits he intended. (Myers, Tr. 505–06, 675–76). Myers, personally, and Talisman, of which Myers was the major shareholder, were the general partners of the Kent Land Limited Partnership. (Def.Ex. EEE, at 18, 23). Myers and Talisman would receive 35% of the profit on the sale of the Kent Parcel. (Def.Ex. EEE, at 8–9). Myers admitted that the sale of the Kent Land Option was his idea as a way of solving the Kent Land problem by paying debt service on the mortgage for three years during which the land might be rezoned. (Myers, Tr. 675–76).

Myers also testified that the Durham transaction and the Kent Land Option were independent transactions. (Myers, Tr. 740). The Court finds Myers testimony unworthy of belief. The Court, on the basis of the evidence, finds to the contrary, that the two transactions were interdependent and that Myers insisted that they be so. Pettigrew testified that Myers conditioned the sale of the Durham Parcel on the purchase of the Kent Land Option. (Pettigrew, Tr. 276–77, 284–85). The fact that Myers conditioned the purchase of the Durham Parcel on Pettigrew's purchase of the Kent Land Option is also evidenced by contemporaneously written documents, prepared by Pettigrew's employees, which were received in evidence at trial. (Plf.Ex. 216, 217; Pettigrew, Tr. 249–51). One handwritten document (Plf.Ex. 107) states "3/7/85 Kent 230,000.00 Murray Hardisty charged to 10809 represents reimb of 3 yr option on Seattle property owned by Meyers [sic], purchaser of 53Ac Goodwin. *Meyers [sic] required option as part of sale of 53Ac.* Option was pd by Hardisty to Meyers [sic]." (Emphasis supplied). Another document, entitled "Note to UDI (Wynne) File, 11 June 1985," signed by Pettigrew's secretary, Carla Fulton, states:

At time of negotiation of contract, Myers put up $400,000.00 earnest money. *It was agreed we would purchase, or rather take a 3-year option, on Kent in Seattle, Washington.* At this time (around 3-6-85) Murray Hardisty gave Myers his personal check for about $230,000.00. We reimbursed Murray this amount to his personal account in Fort Worth. Proceeds rec'd 6/10.

(Plf.Ex. 127; Pettigrew, Tr. 249-51, 305) (emphasis supplied).

Myers attempts to cloud the issue by arguing that plaintiffs and Myers were not yet partners on the date that Myers purchased the Durham Parcel. He asserts that he purchased the Durham Parcel anyway because he wanted it for himself whether or not plaintiffs decided later to invest with him. (Def. Proposed Findings, ¶¶ 33-35). However, this argument does not negate the evidence that Myers conditioned his purchase on the purchase of the Kent Land Option. In addition, by this time Myers knew plaintiffs were likely to invest in the Durham Parcel. Thus, the issue is whether Myers intended to defraud plaintiffs by conditioning his purchase of the Durham Parcel on the purchase of the Kent Land Option. The court finds that he did.

At trial, defendants called an appraiser, Gordon Cole, to testify as to the fair market value of the Durham Parcel in March 1985. Mr. Cole testified that the range of the fair market value of the Durham Parcel was between $1.1 million to $1.4 million. (Cole, Tr. 998-99). Upon cross examination, Mr. Cole testified that if a purchaser had been attempting to obtain the best terms he could on March 7, 1985, it is possible that he could have purchased the Durham Parcel for $1.1 million. (Cole, Tr. 999). The Court finds, on the basis of Mr. Cole's testimony, that if Myers had been attempting to buy the Durham Parcel for the lowest price he could on March 7, 1985, he could have bought it for less than the $1,430,000 he paid and closer to $1,100,000. Myers thus signed an agreement by which the purchase price of the Durham Parcel was set up to $330,000 higher than it could have been had Myers negotiated for the lowest price. The Court infers that Myers did not attempt to negotiate for the lowest price and that that failure was a breach of Myers' fiduciary duty to the plaintiff limited partners to represent them fairly and to the best of his ability.

The Option on the Kent Parcel was a sham. Pettigrew testified that "a three year option is almost unheard of." (Pettigrew, Tr. 292). The exercise price of the Option, $3,484,800, was approximately $2.00 per square foot for the Kent Parcel. (Myers, Tr. 505-06). Gary L. Volchok, a real estate broker and salesman who had been familiar with the Kent Parcel for more than 10 years, testified that at no time from 1980 to 1990 was the Kent Parcel ever worth $2.00 per square foot (Volchok, Tr. 312-50; 362-63). The most recent sale, in 1990, was for $0.30 per square foot (Volchok, Tr. 363). In March 1985, when Myers set the exercise price for the Option, the value of the Kent Parcel was 6 to 7 cents per square foot because it was zoned for only agricultural use and because of the property's flooding problem. (Volchok, Tr. 360). Even if the Kent Parcel had been rezoned to allow commercial development, it would have been worth approximately $0.65 per square foot. (Volchok, Tr. 360-62). The Option exercise price was thus greatly inflated. The fact that Hardisty did subsequently look into the zoning problem (Hardisty, Tr. 595-97) does not prove that the Option was a bona fide transaction separate from the purchase of the Durham Parcel. Instead, it merely shows that Hardisty's curiosity compelled him to check into the matter, if only to ensure himself that the Option which he "purchased"—after no negotiations and without any knowledge of its value (Hardisty, Tr. 576-80)—had no value. Schedule D of the Federal tax return for 1985 filed on April 7, 1986 by the Redwood and Mudie joint venture (which held the Durham Parcel) treats the Kent Land Option as worthless, claiming a deduction of $245,000 for a "forfeited option." (Plf.Ex. 103).

The Kent Land Option was never exercised. (Myers, Tr. 505; Pettigrew, Tr. 309). When the Option expired in March 1988, the $230,000 which had been placed in es-

crow to pay the debt service on the Kent Parcel mortgage was entirely depleted. (Plf.Ex. 72).

In an attempt to prove that the Option was not a kickback, Myers reports that Stark's son-in-law, David Baxter, was given the title and escrow work on the Option, holding the $230,000 in trust and using it only for payments on the underlying mortgage and taxes on the Kent Parcel. (Myers, Tr. 742–43; Baxter, Tr. 187–88). Myers thus asks the court to infer that "he did not go out of his way to secrete [the Option] from anyone at Milbank." (Def. Proposed Findings, ¶ 44). However, this evidence is of little probative value and does not negate the weighty evidence regarding Myers' fraud.

The limited partners in the Kent Land Limited Partnership were advised that because of the Option on the Kent Parcel, the $230,000 non-refundable purchase price paid by Hardisty would "cover the costs of the partnership for as much as four years, thus relieving the [Kent Land Limited] partnership's burden of payments...." (Plf.Ex. 212, Myers Group 3/14/85 letter, at 2). The Court finds that it is reasonable to infer that Myers used the Kent Land Option to mollify the Kent Land limited partners and hide the fact that their investment was in jeopardy.

On March 8, 1985, Myers mailed to Stark two letters containing brochures on the Durham Parcel and the Sacramento Parcel. (Stark, Tr. 47–49; Plf.Ex. 38, 142). One brochure purported to present comparable sales of land in the Durham area, but failed to list the prior sale of the Durham Parcel to Redwood in August 1984 for $673,000. (Stark, Tr. 48; Plf.Ex. 142). The representations as to comparable sales contained in the brochure were fraudulent and deceptive in that they failed to disclose that the Durham Parcel had been purchased by Redwood six months earlier (in August 1984) for $673,000, less than half the price for which the property was being offered to Miltland Raleigh–Durham. The brochure and the deceptive chart as to purported comparable sales were prepared by Mudie for Myers. (Myers, Tr. 503–04). At the time Mudie prepared the brochure and chart he knew that the Durham Parcel had

been purchased in August 1984 for $673,-000 because he had put up the $5,000 earnest money deposit for Redwood on the purchase. (Plf.Ex. 99, 99A, 100, 101, 102).

Upon receipt of the March 8, 1985 letters, Stark and Nelson proceeded to solicit funds from Milbank partners for investing in the Durham and Sacramento Parcels. (Stark, Tr. 51–52). In addition, they approached individuals outside of Milbank. (Stark, Tr. 52). As a result, 50 individuals most of whom were partners in Milbank, agreed to invest in the partnerships established by Myers to purchase the Sacramento and Durham Parcels. (Stark, Tr. 52–53).

In April 1985, the Durham Limited Partnership was formed as the vehicle by which the Milbank investors and a limited number of others would invest in the Durham Parcel. (Plf.Ex. 1). The terms of the Durham Limited Partnership Agreement, which was drafted with the active participation of Myers' counsel, reflected the representations which Myers had made earlier to Stark and Blattmachr that Myers would not take any commissions on the purchase of the land. (Stark, Tr. 53–65; Ashton–Blair, Tr. 456–75; Spielberg, Tr. 368–78, 382–94; Plf.Ex. 1, 15, 197, 199, 211). The Agreement provided that "[t]he General Partner [Myers] may not charge the Partnership for any services performed by the General Partner or an affiliate of the General Partner...." (Plf.Ex. 1, § 3.3). This was consistent with the initial draft of the Sacramento Limited Partnership agreement which had been prepared by Myers' counsel, David Spielberg, and which was to be the basis for the Durham Limited Partnership Agreement. (Ashton–Blair, Tr. 473–74). Mr. Spielberg testified that he understood that Myers was to provide certain services to the partnership without cost, including the purchase of the property. (Spielberg, Tr. 393–94, 399–400). Ashton–Blair testified that the intent of the Agreements was that Myers was not to receive any commission on the purchase of the properties. (Ashton–Blair, Tr. 457–58).

The Milbank investors, organized as plaintiff Miltland Raleigh–Durham, provided $907,000 as capital for the Durham Lim-

ited Partnership, constituting 99% of the partnership's capitalization; Myers, as general partner, provided 1% of the capital. (Stark, Tr. 70; Plf.Ex. 4). Stark became a managing partner of the limited partner Miltland Raleigh–Durham. (Stark, Tr. 12).

. On June 10, 1985, the purchase of the Durham Parcel by the Durham Limited Partnership closed. (Stark, Tr. 69; Plf.Ex. 4, 126). Miltland Raleigh–Durham provided the funds for the Durham Limited Partnership to purchase the Durham Parcel, in reliance on Myers' representations. (Stark, Tr. 70; Plf.Ex. 4, 126). Myers required the Milbank investors to reimburse him for the $400,000 earnest money deposit (Stark, Tr. 77; Plf.Ex. 215), which they did. (Stark, Tr. 70; Plf.Ex. 4, 126). At trial, Myers admitted that the Miltland investors reimbursed him for the $400,000 earnest money deposit which he had borrowed from Chemical Bank. (Myers, Tr. 917–18; Stipulation of Counsel, Tr. 305; Plf.Ex. 130). At the time, Myers was general partner of the Durham Limited Partnership. (Myers, Tr. 918–19; Plf.Ex. 1, 12). Myers also charged Miltland for interest on the $400,000. (Stark, Tr. 70; Myers, Tr. 920). Stark testified that the Miltland Raleigh–Durham investors thought that Myers "was using that money to buy that property for us." (Stark, Tr. 70). Myers did not disclose that $230,000 of the $400,000 had been used for non-partnership purposes, the purchase of the Kent Land Option and the payment of the mortgage debt on the Kent Parcel for three years. (Stark, Tr. 70–71; Myers, Tr. 919–20). The result of the Durham transaction was that $230,000 belonging to the Durham Partnership, which had been provided by Miltland Raleigh–Durham, was diverted by Myers for his own purposes.

At the time the Durham Parcel was purchased, the Miltland investors understood that the railroad right of way through the Durham Parcel was about to be abandoned and that the fee to the land underneath the right of way was owned by the Durham Limited Partnership. (Stark, Tr. 86). Subsequently, Stark discovered that the railroad owning the right of way had not only not abandoned it, but was claiming that it owned the fee interest to the land covered by the right of way. (Stark, Tr. 86).

Myers admitted that the railroad owns the fee interest to the land underneath the right of way. (Myers, Tr. 509).

Myers' representations to Stark, Nelson and Blattmachr that he would obtain no benefit for himself in connection with the purchase of the Durham Parcel were false and fraudulent, were known by Myers at the time they were made to have been so, and were made with the intent of not fulfilling them and for the purpose of deceiving and defrauding plaintiffs. Instead of receiving only a share of the profit on the resale of the land, Myers structured the Durham transaction so that he would receive a substantial undisclosed commission or kickback, in the form of the $230,000 paid for the Kent Land Option.

Mudie acted as agent for Myers and as broker on behalf of Miltland Raleigh–Durham in the purchase of the Durham Parcel. Myers himself admitted that he intended to pay Mudie a commission on the purchase of the Durham Parcel. (Myers, Tr. 733–34). Myers and Mudie failed to disclose to Miltland Raleigh–Durham that Mudie was a joint venturer with Pettigrew and Redwood Partners and that he had a 25% equity interest in the Durham Parcel. Such failure to disclose was with fraudulent intent. As a result of his undisclosed 25% equity interest in the Durham Parcel, Mudie fraudulently obtained $153,962 when the sale of the Durham Parcel to the Durham Limited Partnership closed on June 10, 1985. (Plf.Ex. 124, 131, 132).

Subsequent to the purchase of the Durham Parcel by the Durham Limited Partnership, Myers, in breach of the Durham Limited Partnership Agreement and in violation of his duties as general partner of the Durham Limited Partnership, failed to properly fulfill his fiduciary obligations. Myers failed to make mortgage payments which would have led to a non-curable default causing the entire mortgage debt, approximately $500,000, to be immediately due and payable if the limited partner had not made the payment on a day's notice. (Stark, Tr. 94–99; Plf.Ex. 260). Myers failed to make tax payments on the Durham Parcel and the limited partner had to

pay the taxes directly. (Stark, Tr. 100–02; Plf.Ex. 269). Myers failed to pay water assessments for two years and the limited partner paid those charges directly. (Stark, Tr. 103–05; Plf.Ex. 268).

Myers' failure to make the mortgage, tax and water assessment payments on the Durham Parcel constituted a breach of his duty under the Durham Limited Partnership Agreement (Plf.Ex. 1, § 3.1(d)) to pay all claims against the Partnership. (Stark, Tr. 100). Myers improperly abdicated his responsibilities as general partner without consent of the limited partner by delegating his duties to another entity, Landvest Real Estate Group ("Landvest"), and purporting to transfer half his interest in the Durham Limited Partnership to Landvest in violation of § 5.2 of the Durham Limited Partnership Agreement. (Stark, Tr. 97, 106–12; Plf.Ex. 1, 260, 261). Landvest is owned by a close associate of Myers, Charles Baumgardner. (Stark, Tr. 160). Landvest's office is in Mr. Baumgardner's home. (Victors, Tr. 963). In addition, Myers failed to inform the limited partner of offers which were made to buy the land, in violation of the Durham Limited Partnership Agreement. (Stark, Tr. 105–06; Plf. Ex. 1, § 3.2A).

## G. The Sacramento Transaction.

The investment in the Sacramento Parcel, which Stark and Nelson had told Myers they would recommend to Milbank partners, proceeded concurrently with the Durham transaction. In April 1985, Myers met with Blattmachr at Myers' home in Tucson and told Blattmachr that the Durham and Sacramento ventures would be very profitable. (Blattmachr, Tr. 521). Myers reiterated to Blattmachr that "he would take nothing on putting the deal together" and that "he would only make his profit as, if and when it was sold at a profit, and it was more than a 20 percent per year noncompounded return." (Blattmachr, Tr. 522).

The Sacramento Limited Partnership was formed in April 1985 in order to acquire the Sacramento Parcel, with Myers as general partner and plaintiff Miltland Sacramento as the sole limited partner. (Plf. Ex. 2, § 1.4). The Sacramento Limited Partnership Agreement was identical to the Dur-

ham Limited Partnership Agreement, also providing that "[t]he General Partner may not charge the Partnership for any services performed by the General Partner or an affiliate of the General Partner...." (Plf.Ex. 2, § 3.3).

Miltland Sacramento provided $1,386,000 as capital to the Sacramento Limited Partnership to be used to purchase the Sacramento Parcel. (Plf.Ex. 2, § 2.1, Ex. A). This amount constituted 99% of the capitalization of the Sacramento Limited Partnership. (Plf.Ex. 2, § 2.1, Ex. A). Myers, as general partner, contributed 1% of the capital of the Sacramento Limited Partnership. (Plf.Ex. 2, § 2.1, Ex. A).

The purchase of the Sacramento Parcel by the Sacramento Limited Partnership closed on May 10, 1985. (Stark, Tr. 65; Plf.Ex. 45). The capital which Miltland Sacramento contributed to the Sacramento Limited Partnership purchased a limited partnership interest in the Sacramento Limited Partnership, in reliance on Myers' representations. (Plf.Ex. 1, § 1.2; Plf.Ex. 45). The contributed capital was used to purchase the Sacramento Parcel. (Stark, Tr. 66–67; Plf.Ex. 1, § 2.3; Plf.Ex. 45).

Myers' representations to Stark, Nelson and Blattmachr that he would obtain no benefit for himself in connection with the purchase of the Sacramento Parcel were false and fraudulent, were known by Myers to be false and fraudulent and were intended by Myers to defraud Miltland Sacramento. At the closing of the purchase of the land by the Sacramento Limited Partnership on May 10, 1985, Myers, through his wholly-owned corporation Myers Capital Corporation and his partnership Myers Group Three Limited Partnership (of which he was the general partner), and contrary to Myers' representations that he would receive no financial benefit until the Sacramento Parcel resold, received a benefit at the expense of plaintiff Miltland Sacramento in the amount of $114,425.50. (Spielberg, Tr. 401–10; Plf.Ex. 200 (items 16, 17), 200A).

The Sacramento Parcel was approximately half of a 64.41 acre parcel which Myers Capital Corporation and Myers Group

Three Limited Partnership agreed to buy on August 30, 1984. (Spielberg, Tr. 401–10). In that agreement, the seller agreed to pay a 10% commission, based on the $2,581,000 purchase price for the entire 64.41 acres, to another Myers' entity, The Myers Group, Inc. (Plf. Ex. 200 (item 1)). When Myers agreed to purchase half of the 64.41 acres for Miltland Sacramento—the Sacramento Parcel—he represented that he would obtain no commission or financial benefit in connection with the purchase of that land. (Stark, Tr. 23–26).

At the closing of the purchase of the other half of the 64.41 acres, known as the Placer Industrial Park (Phase I), Myers Capital Corporation, Myers Group Three Limited Partnership and the limited partnership for which they were acting, Stanford–Placer County Industrial Park Limited Partnership ("Stanford–Placer Limited Partnership"), were credited with $228,851 against the amount due to purchase their half of the 64.41 acres based on the 10% commission on the purchase price for the entire 64.41 acres. (Spielberg, Tr. 401–10; Plf.Ex. 200A). Myers Capital (which Myers owned) and Myers Group Partners Six Limited Partnership (of which Myers was the general partner) were the general partners of Stanford–Placer Limited Partnership. (Plf.Ex. 200 (items 14, 15, 17); Spielberg, Tr. 376).

Thus, the amount which the Myers entities actually paid for their half of the property was reduced by $228,851, based on a 10% commission on the price of the entire property, including the purchase of the Sacramento Parcel for Miltland Sacramento. (Spielberg, Tr. 401–10; Plf.Ex. 200A). Miltland Sacramento received no "credit" for the 10% commission. The economic result of this transaction was that Myers or his affiliated entities benefited from the full amount of a 10% commission on the entire 64.41 acres by having the amount they paid for half of the property, $1,389,-141, reduced by $228,851, while, Miltland Sacramento paid the full amount of the purchase price allocable to its half. Thus, Myers and his other related entities benefited by approximately $114,425.50 at Miltland Sacramento's expense.

Defendants argue that Nelson testified that he saw and read the contract for purchase of the Sacramento property before plaintiffs decided to invest in it (Nelson, Tr. 619–20) and that the contract contained the commission agreement. (Def. Proposed Findings, ¶ 87). Presumably, defendants would have the court infer that plaintiffs are therefore somehow barred from complaining about the commission. However, defendants misconstrue Nelson's testimony which concerns Nelson's first visit to the Sacramento Parcel on February 28, 1985 during his property viewing trip with Myers. Nelson testified that Myers' representatives at the site said that they were going to lose the ability to purchase the property unless they came up with over $250,000 by the next day. (Nelson, Tr. 620). Nelson asked if he could see the contract because he thought it would be a shame, based upon what he had been told, to lose such an opportunity. (Nelson, Tr. 620). He looked at the contract and "told them [he] believe[d] that they were misreading that particular clause, that they did not in fact have to make that investment...." (Nelson, Tr. 620). Thus, there is no evidence that Nelson became aware of any commission agreement in the contract. In fact, there is no evidence that Nelson thoroughly read the contract at all but merely that he read a particular clause. Moreover, at the time that Nelson saw the contract, before the property viewing trip had even concluded, plaintiffs had not yet decided whether they would invest with Myers at all, let alone on the Sacramento Parcel. Thus, the court finds no basis to infer from Nelson's testimony that plaintiffs were aware of any commission agreement on the Sacramento Parcel.

Subsequent to the purchase of the Sacramento Parcel by the Sacramento Limited Partnership, Myers improperly abdicated his responsibilities as general partner without the consent of the limited partner by also delegating his Sacramento Limited Partnership duties to Landvest. (Stark, Tr. 108; Plf.Ex. 262). Myers purported to assign half of his interest in the Sacramento Limited Partnership to Landvest without the limited partner's consent, in violation of

§ 5.2 of the Sacramento Limited Partnership Agreement (Stark, Tr. 112–13; Plf.Ex. 2).

In April 1990, the Sacramento Limited Partnership received an offer from Stanford Ranch to purchase the Sacramento Parcel at a price of $1.15 a square foot which would have yielded a substantial profit to the limited partnership; consequently, Miltland Sacramento (the limited partner) requested Myers (the general partner) to sell. (Stark, Tr. 83–84, 113–16, 147–49). The Sacramento Limited Partnership Agreement (Plf.Ex. 2) provides in § 3.2(d) that "[t]he General Partner [Myers] shall, at the direction of the Limited Partner and subject to its approval of the terms thereof, use all reasonable efforts" to sell the Sacramento parcel after it had been owned by the Partnership for six months. Myers refused to accept the offer despite the fact that the limited partners wished to sell and had the right to direct a sale under the Sacramento Limited Partnership Agreement. (Stark, Tr. 113–16, 145–49; Plf. Ex. 2, § 3.2(d)). Under the terms of the Sacramento Limited Partnership Agreement, Myers would not participate in the profit of a sale to Stanford Ranch because the limited partner was entitled to a 20% annualized return and the Sacramento Parcel had been held for 5 years. (Stark, Tr. 145–49, Plf. Ex. 2, § 6.2). Myers' refusal to sell violated his fiduciary and contractual duties to Miltland Sacramento. As a result of Myers' wrongful refusal to accept the offer to purchase the Sacramento Parcel in April 1990, the sale of the parcel was lost. (Stark, Tr. 113–16). Myers also breached his fiduciary duties by failing to provide the limited partner with financial information regarding the Sacramento limited partnership. (Stark, Tr. 1041–42).

### H. The Chicago Transaction.

On or about August 20, 1986, Myers called Blattmachr and asked him whether the Milbank partners would have any interest in investing in an approximately 145 acre parcel of land outside of Chicago, Illinois (the "Chicago Parcel"). (Blattmachr, Tr. 528). Myers told Blattmachr that the Chicago Parcel was maybe the best land that he had ever found. (Blattmachr, Tr.

528). Blattmachr set up a conference telephone call between Myers, himself, Nelson and another Milbank partner, Kevin Hackett which occurred on August 30, 1986. (Blattmachr, Tr. 528, 533).

In the telephone conversation on August 30, 1986, Myers reiterated that he felt the Chicago Parcel was a "great buy". (Blattmachr, Tr. 529, 533). Blattmachr expressly asked Myers whether any investment by the Milbank partners would be made on the same terms as the prior Durham and Sacramento investments. (Blattmachr, Tr. 529). Blattmachr testified that he said

> Mike, let me make sure the circumstances under which this arrangement would occur. I want to be sure that this is like all our prior deals. You have no money going in, no fees or anything, no money for management, and nothing coming out. We get the same 20% preferred return. He [Myers] said, "Jonathan, that's it, just like all the other deals."

(Blattmachr, Tr. 529). Blattmachr further testified that on the basis of Myers' representations he recommended that the Milbank partners invest in the Chicago Parcel. (Blattmachr, Tr. 530; Plf. Ex. 51).

In October, 1986, Myers requested that Stark and Nelson make a $50,000 deposit on the Chicago Parcel which Myers said was needed as an earnest money deposit to "preserve that property for investment." (Stark, Tr. 121–25). Stark and Nelson made the deposit. (Stark, Tr. 121–25; Plf. Ex. 52, 54). In fact, Myers made the request for the $50,000 for his own purposes since the $50,000 payment which he claimed was necessary to hold the Chicago Parcel had actually been made on August 29, 1986 upon the signing of the agreement to purchase the property. (Plf.Ex. 60, "Real Estate Sale Agreement," § 2A; Stark, Tr. 123–24).

In November 1986, the Chicago Limited Partnership was formed as a limited partnership to acquire the Chicago Parcel, with Myers Financial as the sole general partner. (Plf.Ex. 3). Myers Financial was wholly owned by Myers. (Stark, Tr. 127). Plaintiff Miltland Chicago–Santa Fe, made

up mostly of Milbank attorneys, became a 34% limited partner and Chicago–Santa Fe Corporation, owned by the Mehta family, became a 65% limited partner. (Blattmachr, Tr. 530; Stark, Tr. 17). Miltland Chicago–Santa Fe provided $1,115,000 for capital in the partnership which constituted approximately 34% of the $3,250,000 capitalization of the Chicago Limited Partnership. (Plf.Ex. 3, § 2.1, Ex. A; Plf.Ex. 219A). The amount was paid by Miltland Chicago–Santa Fe to the Chicago Limited Partnership in return for its limited partnership interest. (Plf. Ex. 3, § 2.1, Ex. A). The purchase of the Chicago Parcel by the Chicago Limited Partnership closed on December 6, 1986. (Plf.Ex. 219 (Ex. D); Plf. Ex. 219B).

Myers' representations to Blattmachr that he would take no commission were false and fraudulent, were known by Myers to be false and fraudulent when made and were intended by Myers to defraud Miltland Chicago–Santa Fe. Contrary to Myers' representation that he would receive no fees or commissions in connection with the purchase of the Chicago Parcel, Myers personally took a "commission" of $308,014.92 in connection with the closing of the purchase in December 1986, by wire transfer of that amount from the closing escrow to his personal account at First Interstate Bank of Arizona. (Plf.Ex. 219 (Ex. C); Plf.Ex. 219A).

Thomas Smith (Smith), a partner at Deloitte & Touche ("Deloitte"), testified that his firm had reviewed the books and records of the Chicago Limited Partnership and found that $308,000 had been paid at the closing of the purchase of the Chicago Parcel to the Myers Company, although Deloitte could not find any support for such a payment, as a commission or otherwise. (Smith, Tr. 1023, 1026; Plf.Ex. 256). Deloitte found no evidence that any other person who participated received any part of the $308,000 as a commission. (Smith, Tr. 1026).

Myers admits that he took the $308,000 commission (Myers, Tr. 769), but argues that plaintiffs knew about the commission before and after they invested. He testified that on August 28, 1986, before plaintiffs had decided to invest, he sent plaintiffs copies of the purchase agreement and escrow instructions. (Myers, Tr. 763–64, Ex. Q). On November 18, 1986, after plaintiffs had invested, he sent plaintiffs copies of the Limited Partnership Agreement and escrow instructions. (Myers, Tr. 767–68; Ex. 55). He also sent them the closing binder after the transaction had closed. (Myers, Tr. 768–69; Ex. 58). Myers argues that each of these documents showed his $308,000 commission. (Def. Proposed Findings, ¶¶ 48, 61). Thus, Myers asks the court to infer that plaintiffs agreed to pay the commission. Such an inference, however, would be contrary to the evidence before the court. To refute Blattmachr's testimony regarding their agreement—that the deal would have an analogous structure to the two previous transactions, with Myers promising to take no up front fees if plaintiffs invested—Myers' offers only his own self-serving testimony. (Myers, Tr. 769). He does not even refer the court to any of the documents sent to plaintiffs which purport to mention the commission. Furthermore, at least one set of documents—namely, the August 28, 1986 mailing—does not seem to have contained the purchase agreement or escrow instructions which might have referred to commissions. *See* Ex. Q (mentions only "property brochure"). The court finds that plaintiffs invested based on the agreement that Myers would take no up front fees or commissions, that the parties had established a course of dealing by this third transaction which Myers told plaintiffs would remain in effect. Furthermore, whether other investors had considered paying a commission on the Chicago Parcel before plaintiffs decided to invest has no bearing on this case.

In forming the Chicago Limited Partnership (and in the Chicago Limited Partnership Agreement (Plf.Ex. 3)), Myers agreed that Myers Financial would make a capital contribution to the Chicago Limited Partnership of $32,828, that all capital contributed to that partnership would be used only for that partnership's business, "the benefit and advantage of the Partnership and for no other purpose whatsoever," and that no partner would receive any compensation or salary for services to the partnership.

(Stark, Tr. 126; Plf.Ex. 3, § 2.1, Ex. A, §§ 2.3, 3.7). Myers Financial failed to make the required $32,828 capital contribution. (Stark, Tr. 126–27). Stark did not learn that Myers Financial had failed to make its capital contribution to the Partnership until May, 1990 when Landvest forwarded a Statement of Receipts and Disbursements for the Partnership. (Stark, Tr. 127–31; Plf.Ex. 254).

Despite its obligation to do so under the Chicago Limited Partnership Agreement, Myers Financial failed to make its capital contribution. Smith testified that Deloitte's investigation revealed that on December 6, 1986, at the time of the closing of the purchase of the Chicago Parcel, a promissory note in the amount of $32,828, which bore no interest, had no maturity date and was only a conditional obligation to pay—out of the proceeds from the sale of the property, if and when it was sold— was issued by Myers Financial, the general partner of the Chicago Limited Partnership, in place of cash for the general partner's capital contribution. (Smith, Tr. 1027; Plf.Ex. 207).

Myers also took $108,569 from Chicago Limited Partnership funds without the consent or knowledge of the limited partners. Smith testified that the Deloitte investigation found that at the closing of the purchase of the Chicago Parcel there was approximately $173,569 in excess funds after payment of fees and closing costs which resulted in an over-deposit by the limited partners to the escrow account for the closing. Of that $173,569, Myers Financial took $65,000 as a "prepayment" of its management fee for the first 12–month period. (Smith, Tr. 1027–28). Myers Financial took the balance of $108,569 for its own use, issuing in its place a $108,569 non-interest bearing, contingent "promissory note" dated December 15, 1985. (Smith, Tr. 1027–29; Plf.Ex. 208). The $108,569 note bore no interest, had no maturity date and was only a conditional obligation to pay—out of the proceeds from the sale of the property, if and when it was sold. (Smith, Tr. 1027–29; Plf.Ex. 208). Stark testified that Myers never asked the limited partners of the Chicago Limited Partnership for permission to take $108,000 out of the Partnership and that prior to May 1990 Stark was unaware that Myers had done so. (Stark, Tr. 133).

Smith testified that Deloitte could not find any evidence that there was any reason for the $108,569 being taken out of the partnership. (Smith, Tr. 1027–29). Smith testified that the $32,828 promissory note of Myers Financial dated December 6, 1986 and the $108,569 promissory note of Myers Financial dated December 15, 1986 were treated as outstanding loans from the Chicago Limited Partnership to Myers Financial through the balance of 1986, all of 1987, 1988 and 1989, according to the Chicago Limited Partnership's ledger entries. (Smith, Tr. 1029). The Court finds that the $32,828 promissory note and the $108,569 promissory note, neither of which bore interest or had a maturity and were only payable from the proceeds of the sale of the Chicago Parcel, were not bona fide promissory notes.

Smith also testified that the Deloitte investigation disclosed that in September 1990 the notes of $32,828 and $108,569 were offset by two transactions. (Smith, Tr. 1029–30). The first transaction involved $145,000 allegedly payable to Myers as indemnification for amounts paid by Myers in 1989 in settlement of a lawsuit brought by Francis T. Grant ("Grant") against Myers personally in 1987 (the "Grant Suit"). The Grant Suit dealt with an agreement between Myers and Grant dated March 23, 1986 in which Grant was to obtain the investment in the Chicago Parcel by U.S. Trust (Blattmachr, Tr. 546–47; Plf.Ex. 256, at 5). The investor represented by U.S. Trust was the Mehta family whose corporation, Chicago–Santa Fe Corporation, ultimately became the two-thirds Limited Partner in the Chicago Limited Partnership. (Blattmachr, Tr. 527; Plf.Ex. 3). Richard Golub ("Golub"), Myers' lawyer in the Grant Suit, gave an "opinion" that such settlement costs could be charged to the Chicago Limited Partnership as indemnification, which charge was made to the partnership. (Smith, Tr. 1029–30). Later, this $145,000 was capitalized and recorded as an asset called "syndication costs" on the Partnership's general ledger.

(Stark, Tr. 1040; Plf.Ex. 256, at 5). The second transaction purporting to offset Myers Financial's indebtedness to the Partnership involved "consulting fees" paid by Myers Financial to Heritage Corp. ("Heritage"), of which $50,000 was allocated by Heritage as relating to the settlement of the Grant Suit and was charged by Myers Financial to the Partnership. (Plf.Ex. 256, at 6; Smith, Tr. 1030).

These charges aggregating $195,000 were not proper expenses of the Partnership and should not have been charged to the Partnership. The $145,000 payment was made in settlement of a claim by Grant against Myers personally for an obligation Myers incurred some eight months prior to the formation of the Partnership. (Plf.Ex. 256, at 5). There is no authority in the Chicago Limited Partnership Agreement for payment of, or indemnification for, pre-organization expenses or for payment of syndication costs or costs of obtaining investment by a limited partner in the Chicago Limited Partnership. (Plf.Ex. 3). Blattmachr testified that Myers represented that there would be no up front charges of any sort. (Blattmachr, Tr. 529). The $50,000 consulting fee should be treated in the same fashion as the $145,000 settlement cost and therefore was not a proper expense of the Partnership. Moreover, there was no indication by Heritage that its consulting services had been performed for the Chicago Limited Partnership. (Smith, Tr. 1031). There was nothing in the books and records of the Chicago Limited Partnership which indicated that the Partnership owed any money to Heritage. (Smith, Tr. 1031).

In addition, the Partnership was charged $41,000 for a reimbursement to Myers for legal expenses paid to Golub by Myers in connection with the Grant Suit, which Golub also "opined" could be charged to the Partnership. (Smith, Tr. 1030). Golub's $41,000 legal fees should be treated in the same fashion as the $145,000 settlement costs mentioned above and therefore were not a proper expense of the Partnership. Accordingly, the Myers Defendants wrongfully diverted $108,569 of Chicago Limited Partnership funds for his personal benefit. Myers and Myers Financial also improperly

charged to the Chicago Limited Partnership approximately $236,000 in 1990 for settlement costs, Heritage "consulting fees" and Golub legal fees which were incurred as a result of the Grant Suit.

Myers Financial also improperly abdicated its responsibilities as general partner of the Chicago Limited Partnership without the consent of the limited partners by delegating its duties to Landvest. (Stark, Tr. 109–110; Plf.Ex. 263). Myers Financial not only improperly delegated its duties to Landvest, but it also charged the Partnership for Landvest's expenses. Stark testified that Myers Financial charged the Partnership for management and administration fees aggregating $65,000 for 1990 and then charged the Partnership an additional $63,600 for Landvest's expenses in 1990 incurred in performing Myers Financial's duties delegated to Landvest. Stark characterized the charges for Landvest's expenses as a "double charge." (Stark, Tr. 1036–37).

The Chicago Limited Partnership Agreement required Myers Financial to advise the limited partners of all qualified offers to purchase the Chicago Parcel. (Plf.Ex. 3, § 3.9). In violation of this obligation, Myers failed to advise the limited partners that in 1989 Prudential Insurance had offered to purchase the Chicago Parcel. (Stark, Tr. 1038–39).

I. RICO Predicate Acts.

Myers used the mails and wire facilities of interstate commerce to perpetrate his fraudulent scheme from 1985 to at least 1988. Such use of the wires and mails included the following uses and communications, which were made with fraudulent intent and for the purpose of furthering the fraudulent scheme.

(1) In or about December 1984 or January 1985, Myers, in a telephone conversation with Stark, proposed that Stark and others (Milbank partners) provide capital for the limited partnerships in this case. (Stark, Tr. 22–26).

(2) In several telephone conversations with Stark in January and early February 1985, Myers repeated his proposals that

Stark and other Milbank partners provide capital for limited partnerships which would be organized to purchase raw land. (Stark, Tr. 25–26).

(3) In a telephone conversation in late January or early February 1985, Myers suggested to Stark that Stark and Nelson accompany Myers on a trip to inspect raw land for possible investment and to meet some of Myers' employees and associates. (Stark, Tr. 27–28).

(4) In a telephone conversation on or about March 1, 1985, Myers strongly recommended to Stark and Nelson that the Milbank partners invest in the Durham and Sacramento Parcels. (Stark, Tr. 43–44).

(5) In several telephone conversations between March 1–8, 1985, Myers recommended that the Milbank partners invest in the Sacramento and Durham Parcels and asked Stark whether they were willing to do so. (Stark, Tr. 44–45).

(6) On March 7, 1985, Myers caused Chemical Bank to wire the $400,000 to Redwood as the earnest money deposit on the Durham Parcel. (Pettigrew, Tr. 275–276).

(7) On or about March 8, 1985, Myers mailed to Stark and Nelson a letter soliciting investment in the Durham Parcel and enclosing solicitation materials purporting to show comparable land sales in the vicinity of the Durham Parcel, but omitting any mention of Pettigrew's August 1984 purchase of the property. (Stark, Tr. 47–48; Plf.Ex. 142).

(8) On March 8, 1985, Myers mailed a letter to Stark and Nelson soliciting investment in the Sacramento Parcel and enclosing solicitation materials. (Stark, Tr. 49; Plf.Ex. 38).

(9) On May 31, 1985, Michael Casey, on behalf of Myers, mailed a letter to Stark containing, among other things, an explanation of the Sacramento Parcel closing. (Stark, Tr. 74–75; Plf.Ex. 175).

(10) On May 31, 1985, Casey, acting for Myers, mailed a letter to Stark enclosing the Myers Miltland Raleigh–Durham Limited Partnership Agreement and a Certificate of Limited Partnership. (Stark, Tr. 75–76; Plf.Ex. 178).

(11) On June 7, 1985, Casey, acting for Myers, mailed a letter to Stark requesting that Myers be reimbursed $400,000 for the earnest money deposit on the Durham Parcel. (Stark, Tr. 76–77; Plf.Ex. 215).

(12) On or about June 10, 1985, Myers caused Miltland Raleigh–Durham to wire $875,000 to purchase the Durham Parcel. (Stark, Tr. 70; Plf.Ex. 126, "Revised Closing Statement").

(13) Between March 7, 1985 and June 10, 1985, Myers made numerous telephone calls to Stark encouraging him on the Durham and Sacramento ventures. (Stark, Tr. 71–72).

(14) On July 23, 1985, Myers mailed a letter to Stark which, among other things, discussed the financial arrangements for the investments in the Durham and Sacramento Parcels. In this letter, Myers wrote, "[a]s you will recall, in all of our discussions, it was the intent in these partnerships that you put up all the cash, that I do the work, that you receive your money back and we split the profit." (Stark, Tr. 77–79; Plf.Ex. 62).

(15) On September 18, 1985, Myers mailed a letter to Stark and Nelson in which he painted an optimistic picture of the resale prospects for the Durham and Sacramento Parcels. (Stark, Tr. 79–80; Plf.Ex. 29).

(16) On December 4, 1985, Henry Sperry, acting for Myers, mailed a letter to Stark and Nelson which enclosed a November 13, 1985 letter to Linda Koplowitz, Myers' agent, which painted an optimistic picture of the resale prospects of the Sacramento Parcel. (Stark, Tr. 82; Plf.Ex. 68).

(17) On January 2, 1986, Myers mailed a letter to Peter Mudie, with carbon copies to Stark and Nelson, falsely stating that Mudie has "picked up the railway right of way for the benefit" of the Durham Limited Partnership. (Stark, Tr. 84–86; Plf.Ex. 258).

(18) On January 30, 1986, Myers mailed a letter to Stark painting an optimistic picture of the resale prospects of the Durham and Sacramento Parcels. (Stark, Tr. 87; Plf.Ex. 27).

(19) On April 17, 1986, Myers mailed a letter to Stark painting an optimistic picture of the resale prospects of the Durham and Sacramento Parcels. (Stark, Tr. 87–89; Plf.Ex. 10).

(20) In July 1986, Myers called Blattmachr on the telephone and requested him to come to Myers' home in Sun Valley, Idaho to discuss the Miltland transactions. (Blattmachr, Tr. 522–23).

(21) On or about August 20, 1986, Myers telephoned Blattmachr and asked him whether the Milbank partners would be interested in investing in the Chicago Parcel. (Blattmachr, Tr. 528).

(22) On July 23, 1986, Myers mailed a letter to Stark lulling plaintiffs into believing that nothing was wrong with their investments. (Stark, Tr. 89–90; Plf.Ex. 25).

(23) On August 28, 1986, Myers mailed a letter to Blattmachr enclosing solicitation materials on the Chicago Parcel. (Blattmachr, Tr. 531–33; Plf.Ex. 51).

(24) On August 30, 1986, Myers, in a telephone conference with Blattmachr, stated that he would arrange for the purchase of the Chicago Parcel on behalf of Milbank investors and would not receive any financial benefit at the inception of the transaction but would only share in profits upon resale. (Blattmachr, Tr. 529–33).

(25) On September 15, 1986, Ellen R. Libertine, Myers' Administrative Assistant, mailed a letter to Stark, at Myers' direction, enclosing material on a purported offer to purchase the Durham Parcel. (Myers, Tr. 774–76; Def. Ex. N).

(26) On October 10, 1986, in response to a request from Myers falsely stating that funds were required to purchase the Chicago Parcel, Stark and Nelson caused Citibank to transfer by wire $50,000 to Myers. (Stark, Tr. 121–25; Plf.Ex. 52).

(27) On October 27, 1986, Myers mailed a letter to Nelson acknowledging receipt of a $50,000 deposit on the Chicago Parcel. (Stark, Tr. 125; Plf.Ex. 54).

(28) On November 18, 1986, Myers mailed a letter to Nelson forwarding copies of the Chicago Limited Partnership Agreement. (Myers, Tr. 768; Plf.Ex. 55).

(29) In December 1986 or January 1987, Myers caused copies of documents from the closing of the purchase of the Chicago Parcel to be sent to Stark. (Stark, Tr. 122–23; Plf.Ex. 60).

(30) On January 29, 1987, Mary McArthur, acting for Myers, mailed a letter to Nelson enclosing a copy of the closing documents on the purchase of the Chicago Parcel. (Myers, Tr. 768; Plf.Ex. 58).

(31) On November 9, 1987, Myers mailed a letter to Stark painting an optimistic picture of the resale prospects for the Sacramento Parcel. (Stark, Tr. 90; Plf.Ex. 19).

(32) On November 9, 1987, Myers mailed a letter to Stark regarding the Durham Parcel representing that a bid for the construction of proposed roads and utilities on the Parcel had been procured. (Stark, Tr. 90–91; Plf.Ex. 22).

(33) On November 9, 1987, Myers mailed a letter to Stark painting optimistic picture of the resale prospects of the Chicago Parcel. (Stark, Tr. 91–92; Plf.Ex. 23).

(34) On April 7, 1988, Stewart Emery, acting for Myers, mailed a letter to Stark painting an optimistic picture. (Stark, Tr. 92; Plf.Ex. 267).

(35) During 1986, 1987 and 1988, Myers frequently advised Stark in telephone conversations that matters were going well with the Miltland ventures. (Stark, Tr. 93–94).

Myers' sale to plaintiffs of limited partnership interests in the Sacramento Limited Partnership on May 10, 1985, the Durham Limited Partnership on June 10, 1985 and the Chicago Limited Partnership on December 6, 1986 constituted sales of securities in connection with Myers' fraudulent conduct.

J. Myers' Defense.

At all times Myers had his own counsel representing him in connection with the Raleigh–Durham Limited Partnership, the Sacramento Limited Partnership and the Chicago Limited Partnership. With regard to the Durham and Sacramento transactions, Myers' counsel were David Spielberg, Rex Brown and Michael Casey. (Spielberg, Tr. 371–401; Plf.Ex. 197, 198;

Ashton–Blair Tr. 433–37, 473). With regard to the Chicago transaction, Myers' counsel was Jay Vogelson. (Plf.Ex. 54, 259). At no time did Milbank, Tweed, Hadley & McCloy act as his counsel with regard to those partnerships. (Stark, Tr. 1032–33; Ashton–Blair, Tr. 473; Spielberg, Tr. 371–401). Myers does not dispute any of these facts.

Myers took advantage of and breached his fiduciary duties to the plaintiff investors in this case. Neither plaintiffs nor Milbank breached any duty to Myers.

### K. Removal of Defendants As General Partners.

The Court finds that under all the circumstances, Myers and Myers Financial have not served faithfully, fairly and in the best interests of the limited partnerships in this case. Stark, a managing partner of all three plaintiffs, testified that

> The limited partners have lost confidence and believe that the general partner is not honest, after seeing, after learning of the undisclosed $230,000—I call it kickback—in the Durham situation and the unauthorized commissions that he took.

(Stark, Tr. 1041). Defendants' own witness, Alexis Victors, the individual directly managing the three limited partnerships in this case, testified that the relationship between the general partners (Myers and Myers Financial) and the limited partners is "not a healthy relationship". (Victors, Tr. 971–72).

Based on all the circumstances, the Court finds that Myers and Myers Financial can no longer serve in good faith and faithfully as general partners of the limited partnerships in this case and that they should be removed as general partners.

### L. Damages.

The following damages have been incurred as a result of the Myers Defendants' wrongful conduct.

(1) Plaintiff Miltland Raleigh–Durham has been damaged in the amount of $383,962 as a result of Myers' fraud and breach of fiduciary duty, including $230,000 in damages from the purchase of the Kent Land Option and $153,962 as a result of Mudie's fraudulent receipt of plaintiff's funds.

(2) Plaintiff Miltland Sacramento has been damaged in the amount of $114,425.50 as a result of Myers' fraud and breach of fiduciary duty in obtaining a financial benefit for Stanford–Placer County Industrial Park Limited Partnership—in which Myers had an interest—in connection with the purchase of the Sacramento Parcel.

(3) The Chicago Limited Partnership has been damaged in the amount of $308,014.92 as a result of Myers' fraud and breach of fiduciary duty in taking a commission in that amount in connection with the purchase of the Chicago Parcel. Plaintiff Miltland Chicago–Santa Fe, as the 34% limited partner in the Chicago Limited Partnership, has been damaged in the amount of $104,725.07—34% of the $308,014.92 commission on the purchase of the Chicago Parcel.

(4) The Chicago Limited Partnership has been damaged in the amount of $108,569 as a result of the Myers Defendants' fraud and breach of fiduciary duty in their diversion of partnership funds in that amount for Myers' personal benefit. Miltland Chicago–Santa Fe has been damaged in the amount of $36,913.46—34% of the $108,569 which Myers and Myers Financial diverted from Chicago Limited Partnership funds.

(5) The Chicago Limited Partnership has been damaged in the amount of $32,828 as a result of Myers Financial's wrongful failure to make a capital contribution in that amount. Miltland Chicago–Santa Fe has been damaged in the amount of $11,168.32—34% of the $32,828 capital contribution which Myers Financial wrongfully failed to make to the Chicago Limited Partnership.

(6) The Chicago Limited Partnership has been damaged in the amount of $236,000 for the Myers Defendants' wrongful charges to the Partnership relating to the Grant suit—namely, $145,000 in settlement costs, $50,000 in consulting fees to Heritage and $41,000 in legal fees to Golub—where such charges to the partnership were solely for Myers' and Myers Financial's benefit. Miltland Chicago–Santa Fe has been damaged in the amount of $80,-

240—34% of the $236,000 which the Myers Defendants' wrongfully charged to the Chicago Limited Partnership for reimbursement of expenses relating to the Grant Suit.

*III. Defendants' Motions to Strike Evidence*

On February 10, 1992, defendants made three motions to strike evidence. Plaintiffs responded on May 28, 1992. Each is discussed in turn.

A. Motion to Strike Parol Evidence.

■ Plaintiffs argue that Myers made repeated representations to them that he would not take any commissions or up front fees at the inception of the three transactions but would only obtain financial reward when he shared in the profits upon the land's resale. Defendants object to testimony regarding oral promises since plaintiffs pled breach of a written contract, not an oral contract, and since the transactions are evidenced by three written contracts which contain merger clauses. Defendants ask the court to strike testimony on the oral promises as parol evidence.

The parol evidence rule has no applicability to this case. That rule, as stated by Professor Corbin (quoted with approval by the Second Circuit in *Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 26 (2d Cir.1988)), excludes evidence only when it is offered "for the purpose of varying or contradicting" a contract.

The evidence which defendants seek to strike—Myers' representations that he would not take any commissions or up front fees at the inception of the transactions—was not offered to and does not contradict the terms of the limited partnership agreements. To the contrary, Myers' representations are consistent with the limited partnership agreements which prohibit the general partner (Myers) from, among other things, receiving any compensation or charging for his services to the partnerships.

■ In addition, even if the court had doubts as to whether the limited partnership agreements encompassed Myers' representations, testimony regarding the rep-

resentations would still be admissible since it is well established that parol evidence is admissible for the purpose of aiding in the interpretation of a contract. *Garza v. Marine Transport Lines, Inc.,* 861 F.2d at 26–27; *Official Publications, Inc. v. Kable News Co.,* 775 F.Supp. 631, 638 (S.D.N.Y. 1991).

■ Finally, even if the court had concluded that testimony regarding Myers' representations violated the parol evidence rule on plaintiffs' breach of contract claim, the testimony would remain admissible on plaintiffs' other claims. Plaintiffs contend that Myers' statements were fraudulent misrepresentations of fact because, at the time they were uttered, Myers had no intention of honoring them. Plaintiffs assert that, to the contrary, Myers intended to obtain for himself secret financial benefits at the very beginning of the investments. Thus, plaintiffs' fraud claims (RICO, securities, common law and breach of fiduciary duty) stand distinct from plaintiffs' claims of breach of the partnership agreements.

The parol evidence rule does not preclude proof of an oral misrepresentation of intention such as Myers made here. *Adams v. Gillig,* 199 N.Y. 314, 319–20, 92 N.E. 670, 671–72 (1910); *see Laird v. Integrated Resources, Inc.,* 897 F.2d 826, 830–31 (5th Cir.1990) ("10b–5 is a fraud-based cause of action and ... the parol evidence rule does not bar evidence of fraud.... Application of the parol evidence rule to 10b–5 ... would eviscerate the protection the Act affords to the investing public.").

The presence of a merger clause does not change the result since "[i]t is well-established that a general 'boilerplate' merger clause is ineffective to preclude judicial inquiry into specific allegations of fraud." *O'Keeffe v. Hicks,* 74 A.D.2d 919, 919, 426 N.Y.S.2d 315, 316 (2d Dep't 1980) (citation omitted). Therefore, there is no basis for striking evidence regarding Myers' representations.

B. Motion to Strike Evidence of Events Which Occurred After the Filing of the Complaint.

■ Defendants move to strike evidence of transactions, occurrences and events

which took place after the filing of the Amended Complaint on August 9, 1990. This is a renewal of defendants' objection at trial which was raised when plaintiffs first offered such evidence. The court admitted the challenged testimony into evidence as relevant to plaintiffs' claims that Myers has breached his fiduciary duties.

Defendants assert, in accordance with Rule 15(d) of the Federal Rules of Civil Procedure, that transactions, occurrences and events which happened after the date of the pleading must be pled in a supplemental pleading. Otherwise, they argue, it cannot be received at trial. Defendants claim that plaintiffs filed no such pleading, nor notified defendants that plaintiffs intended to offer such evidence at trial. Therefore, defendants argue that allowing plaintiffs to offer such evidence at trial amounts to "trial by ambush."

Defendants' objection is without foundation. From the commencement of this case defendants have been on notice of plaintiffs claims regarding Myers' actions as general partner. The March 6, 1989 Complaint charges Myers with breach of fiduciary duty, seeks his removal as general partner of the three limited partnerships, an accounting by Myers and a permanent injunction enjoining him from committing further wrongful acts. The breach of fiduciary duty claims, together with additional breaches of fiduciary duty by Myers, were repled in the Amended Complaint. They were also squarely raised in the Pretrial Order. Under ¶ 4 ("Relief Prayed"), the Pretrial Order specifies that plaintiffs seek equitable relief against the Myers Defendants, accountings from them, their removal as general partners and a permanent injunction enjoining them from committing further wrongful acts. Plaintiffs allege in ¶¶ 36–38, 41 of the Pre-trial Order ("Contentions of Fact") that the Myers Defendants have breached their fiduciary duties to plaintiffs. The Pretrial Order specifically refers to Myers' improper abdication of his responsibilities as general partner and Myers' continuing efforts to conceal his fraud. (Pretrial Order, ¶¶ 29, 33, 38). The challenged testimony bears directly on Myers' continuing breaches of fiduciary duty.

Furthermore, Myers himself put his continuing conduct as general partner in issue. First, Myers asserted as a Contention of Fact in the Pretrial Order (¶ 53) that he and Myers Financial had "managed the three partnerships with reasonable competence and in good faith in spite of frequent interference and harassment by representatives of plaintiffs."

■ Second, defendants offered the testimony of Alexis Victors, whose firm Victors and Associates was retained by Myers (through Landvest) in the fall of 1990—after the filing of the Amended Complaint—to manage the partnerships' properties. (Victors, Tr. 942). Mr. Victors testified on direct about the efforts he had undertaken to prepare the partnership properties for resale and detailed what he considered to be the difficulties preventing such resale. (Victors, Tr. 943–959). Included was testimony regarding the retention of Irv Reos as the broker for the Sacramento Parcel (Victors, Tr. 944), engineering studies done on the Durham property (Victors, Tr. 946–49), efforts to have the railroad tracks removed from the Durham property (Victors, Tr. 949–53) and the Antonio and other subsequent offers on the Chicago Parcel. (Victors, Tr. 953–59). All of Mr. Victors' testimony concerned post-August 1990 events (since he had no knowledge of earlier events) and opened the door to evidence as to Myers' management of the partnerships after the filing of the Amended Complaint.

■ Third, Myers, by his own direct testimony, opened the door at trial to all evidence bearing on his conduct of the business of the partnerships. In response to his counsel's question as to whether Myers believed he had managed the three partnership properties competently, Myers testified: "Yes. In my opinion we've gone overboard to manage these properties and spent a lot of money doing it." (Myers, Tr. 776). In light of this statement, Myers can hardly argue that any evidence as to his conduct of partnership affairs is beyond the scope of relevance. It is especially important to note that Myers himself put his conduct of partnership affairs in issue

generally by the foregoing question and answer at trial. Neither the question nor the answer was limited in any way to specific matters or time. Thus, the question and answer made Myers' entire conduct of partnership business—from the inception of the partnerships to the date of his testimony—fair subject of cross-examination and contrary proof. On that basis alone, defendants cannot now argue that the challenged testimony is inadmissible.

Thus, the areas of testimony which defendants claim were presented by "surprise" were either specifically addressed in the Amended Complaint or the Pretrial Order, or were raised by Myers or his witness, Alexis Victors, at trial. The Second Circuit has recently addressed the very objection which defendants make—the admission of evidence of events alleged to have occurred after the service of the complaint. In *Jund v. Town of Hempstead*, 941 F.2d 1271, 1286–88 (2d Cir.1991), defendant argued, like defendants here, that because plaintiff did not amend the complaint pursuant to Rule 15(d), he was precluded from presenting evidence related to claims not contained in the pleadings. In rejecting this argument, the court stated that "the Town's reading of the Federal Rules is far too restrictive." *Id.* at 1287. The court then went on to quote Rule 15(b):

> When issues not raised by the pleading are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the

party's action or defense upon the merits.

The court went on to find that defendants were on notice of plaintiff's post-complaint claims and his intent to offer evidence related to them. Given this lack of prejudice, the court held that amendment of the pleading was unnecessary and that "the failure to amend will not affect the judgment rendered." *Jund*, 941 F.2d at 1287.

This case dictates the same result. The evidence of post-complaint events which defendants seek to strike arise out of the scheme that was the focus of the pleadings and are directly related to Myers' earlier wrongdoing. Such evidence shows continuing breaches of Myers' fiduciary duties to plaintiffs, duties which are derived from the Limited Partnership Agreements which have been pleaded since this action was commenced. Given that Myers was on notice as to plaintiffs' intent to introduce evidence of post-complaint events, he cannot show prejudice. Therefore, defendants' motion to strike evidence of post-Amended Complaint events is denied.

### C. Motion to Strike Evidence Admitted Subject to Proof of Conspiracy.

██ Defendants move to strike evidence which plaintiffs offered and which was received subject to connection under the co-conspirator statement hearsay exception, Rule 801(d)(2)(E) of the Federal Rules of Evidence ("FRE"). Since the evidence admitted by the court under this exception was limited, defendants' motion actually seeks to strike only two areas of evidence: (1) testimony of Steven Walker, a former Myers employee, that Mudie told him to "drop" a contract to purchase the Durham Parcel because it would anger Myers if he did not do so (Walker, Tr. 170–73); and (2) certain documents produced by agents of Pettigrew which were admitted at trial. (Plf.Ex. 102, 107). Defendants argue that plaintiffs were unable to prove a conspiracy at trial involving Mudie or Pettigrew and, therefore, that the evidence offered as statements of co-conspirators should be stricken.

However, the court has found that there was a conspiracy. *See* Findings of Fact, *supra.* The evidence strongly supports the conclusion that Myers, Mudie and Pettigrew had an agreement to defraud the actual purchaser of the Durham Parcel (regardless of whether Pettigrew "knew" the name of the investor—plaintiff Miltland Raleigh–Durham) by inflating the stated purchase price and kicking $230,000 back to Myers through the sale of the Option on the worthless Kent Parcel. No other conclusion is logical or supported by the evidence. Thus, plaintiffs have sufficiently proved a conspiracy here for purposes of FRE 801(d)(2)(E).

■ The formal agreement which defendants say is a necessity is not required. As Judge Weinstein states, "the very existence of the conspiracy must commonly be inferred after the fact from a series of acts, since there is usually no formal agreement or at least none susceptible of proof." 4 *Weinstein's Evidence,* ¶ 801(d)(2)(E)(01), at 801–335 (1991). "[T]he 'agreement' is simply alleged, and to prove its existence the [plaintiff] presents evidence of the conspirators' conduct—what they said and did—and asks the jury to infer from this conduct that the criminal agreement has been established." *United States v. Calderone,* 917 F.2d 717, 721 (2d Cir.1990), *vacated on other grounds,* —— U.S. ——, 112 S.Ct. 1657, 118 L.Ed.2d 381 (1992).

Defendants challenge the admissibility of the specific co-conspirator statements themselves primarily by arguing that the statements were not made during the course of the conspiracy. Thus, defendants seek to strike the testimony of Walker, a real estate investor who had previously been employed by Myers, who testified that in the fall of 1984 Pettigrew had agreed to sell him the Durham Parcel for $896,790. Walker forwarded Pettigrew a contract to that effect. After doing so, Walker received a visit from Mudie who told Walker to "drop the contract" to purchase the Durham Parcel or else he would anger Myers. Walker subsequently abandoned his contract and his efforts to purchase the Durham Parcel. (Walker, Tr. 170–173).

Defendants argue that Walker's testimony as to what Mudie said to him about dropping his contract to purchase the Durham Parcel or angering Myers should be stricken on the ground that Mudie was not Myers' co-conspirator or agent, and that Mudie's statement to Walker was made prior to the formation of a conspiracy, based upon Myers' self-serving testimony that he knew nothing of the Durham Parcel before January or February 1985.

In fact, Mudie was an agent of Myers. Stark testified that Myers and Mudie both told him in February 1985 that Mudie was Myers' agent for the purchasing of property for Myers. (Stark, Tr. 32–33). Myers, when he testified, did not deny making such statements to Stark.

■ The evidence also establishes that Mudie and Myers were co-conspirators at the time that Mudie made his statement to Walker. Walker testified that Mudie made his statement to him "[e]ither at the very end of December of '84 or very early January of '85." (Walker, Tr. 171). Thus, while Myers testified that he had never heard of the Durham Parcel until January 1985, that does not negate conspiracy even if it were true. Myers also testified that he and Mudie discussed the problem Myers had with Kent Land (i.e. the kickback half of the fraud) in Raleigh–Durham "in October, November, December 1984." (Myers, Tr. 677–78). That admission by Myers at trial is more than sufficient to establish Mudie as his co-conspirator at the time Mudie made his statement to Walker. Moreover, Walker's statement itself may be properly examined by the court in making the determination of admissibility under FRE 801(d)(2)(E), *Bourjaily v. United States,* 483 U.S. 171, 181, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987); *New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1073 (2d Cir.), *cert. denied,* 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988), since there is more than sufficient independent evidence to corroborate it. Thus, the inference is well supported that Myers and Mudie indeed cleared the way for the Durham fraud by scaring away Walker and then

making Durham the first stop on the plane trip with Stark and Nelson.

Testimony also showed that Myers, despite his denials, had previously done business with Pettigrew and Redwood Partners (Pettigrew, Tr. 222–23, 252–54; Myers, Tr. 682–90) and that Myers employed Mudie as his land man in the Raleigh–Durham area. (Stark, Tr. 32; Ashton–Blair, Tr. 438; Myers, Tr. 734). It is undisputed that Mudie, with and undisclosed 25% equity interest in the Durham Parcel, was a secret joint venturer with Pettigrew. Thus, the court finds that Mudie's statement to Walker was made in the course of the conspiracy and, therefore, should not be stricken.

Defendants also seek to strike Walker's testimony that he was told by either Pettigrew or Jim Brady, an officer of Crown Oaks, Inc., one of Pettigrew's corporate entities, that he could not purchase another property in Durham without Myers' approval and that selling it to Walker would create a problem with Myers. (Walker, Tr. 178). Defendants again argue that this statement was made outside of the conspiracy's time frame. Walker, however, testified that these discussions took place in February 1985—at the very time that Myers admits considering the Durham Parcel. (Walker, Tr. 178).

■ Finally, defendants seek to strike Exhibits 102 and 107 and the testimony regarding them. Both exhibits are handwritten documents authenticated by Pettigrew as having been made by one of his employees. (Pettigrew, Tr. 269–74, 287–89). Thus, the exhibits constitute statements by an agent of a co-conspirator and are admissible. Defendants argue that it is unknown on what date these documents were made and there has been no showing that they were made in the course of and in furtherance of the conspiracy. Once again, however, this court may consider, under *Bourjaily*, the documents themselves which demonstrate an on-going conspiracy at the time they were made. These documents, Exhibits 102 and 107, are business records of Redwood whose content clearly demonstrates that they were made contemporaneously with the transactions they memorialized. Both exhibits carry dates indicating that they were made during the conspiracy period. Indeed, Exhibit 107 is dated "3/7/85," the exact date of the meeting between Myers, Mudie, Pettigrew and Hardisty which resulted in the kickback.

Exhibit 107 is the document which states that "Myers required" the Kent Land Option in return for the purchase of the Durham Parcel. It is compelling evidence of the conspiracy. The Exhibit is independently corroborated by Pettigrew's testimony that Myers conditioned the purchase of the Durham Parcel on the purchase of the Kent Land Option. (Pettigrew, Tr. 275–78, 284–85).

■ Myers cites *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), for the proposition that this court must conduct a reliability inquiry as to each co-conspirator statement admitted under FRE 801(d)(2)(E). That is not the law. In *Bourjaily*, the Supreme Court expressly held that an inquiry into independent indicia of reliability is not mandated by FRE 801(d)(2)(E) or the Confrontation Clause of the Constitution, since "co-conspirators' statements, when made in the course of and in furtherance of the conspiracy, have a long tradition of being outside the compass of the general hearsay exclusion." 483 U.S. at 182–183, 107 S.Ct. at 2782. The Court specifically limited *Dutton* to the case where the "evidentiary rule deviates from [the] common-law approach," such as by admitting co-conspirator hearsay statements made after termination of the conspiracy. *Id.* at 183, 107 S.Ct. at 2783. All of defendants' arguments pursuant to the *Dutton* case are therefore irrelevant.

In conclusion, plaintiffs have amply proven a conspiracy among Myers, Pettigrew and Mudie to defraud Miltland Raleigh–Durham by kicking back to Myers $230,000 through the guise of the Kent Land Option. Walker's testimony regarding Mudie's statement to him to "drop his contract" to purchase the Durham Parcel, as well as Exhibits 102, 107, are admissible and Myers' motion to strike that evidence is denied.

*IV. Conclusions of Law*

A. Jurisdiction and Overview.

This court has subject matter jurisdiction of this action by virtue of 28 U.S.C. § 1331; RICO, 18 U.S.C. §§ 1961, *et seq.;* the Exchange Act, 15 U.S.C. §§ 78a, *et seq.;* and the principles of pendant jurisdiction. Venue is proper in this district under 28 U.S.C. § 1391(b); 15 U.S.C. § 78aa; and 18 U.S.C. § 1965.

Plaintiffs established at trial the liability of Myers and Myers Financial on the following claims: (1) civil violation of RICO, 18 U.S.C. §§ 1961, *et seq.;* (2) securities fraud in the sale to plaintiffs of limited partnership interests, in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b–5 thereunder; (3) common law fraud; and (4) breach of fiduciary duty.

In addition, the testimony at trial established that Myers acted fraudulently in all the transactions at issue. Myers' testimony to the contrary conclusively demonstrates his lack of trustworthiness. That lack of honesty compels not only the findings of liability which plaintiffs seek, but also the awards of damages and equitable remedies necessary to compensate plaintiffs and to protect their investments.

B. Plaintiffs' RICO Claims.

■ Myers' fraudulent scheme, by which he obtained substantial sums for his own benefit or for the benefit of entities owned or controlled by him, involving three limited partnerships, land in three states and extending from early 1985 through the commencement of this action, was carried out with the aid of repeated use of the mails and the telephone, as well as fraud in the sale of securities, the limited partnership interests. Myers' use of mails and interstate wires and his fraud in connection with the sale of securities were multiple RICO "predicate acts" over a period of years in furtherance of the fraud and constitute the "pattern of racketeering activity" necessary for a RICO violation.

18 U.S.C. § 1962(c) sets forth the elements of a civil RICO claim:

It shall be unlawful for any person … associated with any enterprise engaged in, or the activities of which affect, interstate commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity….

At trial, plaintiff established each of the elements required under this provision against Myers and Myers Financial.

(1) As defined by 18 U.S.C. § 1961(3), the "persons" who conducted the unlawful activities are Myers and Myers Financial.

■ (2) The association in fact of Myers, Myers Financial, the Durham Limited Partnership, the Sacramento Limited Partnership and the Chicago Limited Partnership constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise"). The Enterprise was and continues to be an ongoing association in fact, functioning as a continuing unit with a community of interest and continuing core of personnel in that it is controlled and directed by Myers with the purpose of defrauding plaintiffs and continuing such fraudulent activities through the continued fraudulent management of the Durham, Sacramento and Chicago Limited Partnerships. *See United States v. Indelicato,* 865 F.2d 1370, 1376–77, 1386 (2d Cir.), *cert. denied,* 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989) (quoting *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1989)).

(3) The Enterprise is, and at all material times has been, engaged in, or its activities have affected, interstate commerce in that plaintiffs, residents of New York, New Jersey, Connecticut and California, were induced by the illegal acts in this case to purchase limited partnership interests in partnerships buying land in Illinois, North Carolina and California. *See, e.g., United States v. Barton,* 647 F.2d 224, 233–34 (2d Cir.) (interstate commerce was affected when New York defendant purchased a house in New Jersey in connection with the illegal enterprise), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981).

■ (4) Myers and Myers Financial—aided and abetted by or in conspiracy with Pettigrew, Redwood and Mudie—have engaged in a "pattern of racketeering activity" within the meaning of 18 U.S.C.

§ 1961(1), (5) by committing numerous acts of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341, 1343 and securities fraud in violation of 15 U.S.C. § 78j.

 a. Myers' fraud in connection with the sale of the limited partnership interests constituted fraud in connection with the sale of securities in violation of Exchange Act § 10(b) and such fraudulent sales were RICO "predicate acts." *E.g., Kravetz v. Brukenfeld,* 591 F.Supp. 1383, 1389–90 (S.D.N.Y. 1984).

 b. The Myers Defendants committed numerous "predicate acts" of mail and wire fraud from late 1984 or early 1985 to at least April 7, 1988 in that they had (a) a scheme to defraud and (b) used the mails and interstate wires on a multitude of occasions in furtherance of the fraudulent scheme. *Galerie Furstenberg v. Coffaro,* 697 F.Supp. 1282, 1288 (S.D.N.Y.1988) (quoting *Tryco Trucking Co. v. Belk Stores Services, Inc.,* 634 F.Supp. 1327, 1333 (W.D.N.C.1986) (a scheme to defraud is a plan whose object is "to deprive one of property through fraudulent or deceptive means, such as material misrepresentation, concealment, breach of duty to disclose information or taking of bribes or kickbacks.")).

The telephone calls or mailings need not have contained misrepresentations themselves. *See Patrick Carter Assoc., Inc. v. Rent Stabilization Ass'n,* 1990 WL 195993, *3, 1990 U.S.Dist. Lexis 15975, *11 (S.D.N.Y.1990). They need only have "advance[d] the execution of the scheme." *In re Gas Reclamation, Inc. Sec. Litig.,* 659 F.Supp. 493, 513 (S.D.N.Y.1987) (citing *United States v. Vardell,* 760 F.2d 189, 190–91 (8th Cir.1985)).

Mailings and telephone calls made to lull and assure investors after the defendant has fraudulently obtained money, such as those made here by Myers and others acting at his direction, constitute mail and wire fraud. *United States v. Sampson,* 371 U.S. 75, 80–81 [83 S.Ct. 173, 176, 9 L.Ed.2d 136] (1962); *Morley v. Cohen,* 888 F.2d 1006, 1009–10 (4th Cir.1989).

(5) Myers and Myers Financial have (1) used and invested the funds obtained from plaintiffs through a "pattern of racketeering activity" in the acquisition of an interest in, and the establishment and operation of, the Enterprise, (2) acquired and maintained an interest in and control of the Enterprise through a "pattern of racketeering activity" and (3) conducted the affairs of the Enterprise, with which they were associated, through a "pattern of racketeering activity," all in violation of 18 U.S.C. § 1962(a)-(c).

(6) The Myers Defendants' activities constitute a "pattern of racketeering activity," meeting the requirements of *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) and satisfying both the "relatedness" and "continuity" requirements. *Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.,* 879 F.2d 10, 15–17 (2d Cir.1989), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 723, 107 L.Ed.2d 743 (1990). "Relatedness" is present since Myers' predicate criminal acts "... have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. at 240, 109 S.Ct. at 2901. The Myers Defendants' criminal predicate acts show "continuity" because the commission of numerous acts of wire, mail and securities fraud over a period of more than four years constitutes a "closed period of repeated conduct" with the aim of defrauding plaintiffs through three separate limited partnerships. 492 U.S. at 241, 109 S.Ct. at 2901. *E.g., San Jacinto Sav. Assoc. v. T.D.C. Corp. of Florida,* 707 F.Supp. 1579 (M.D.Fla.1989) (more than 20 incidents of mail and wire fraud over period of two years in order to induce plaintiffs to pay inflated prices for buildings constituted a pattern of racketeering activity).

(7) The Enterprise, by the Myers Defendants' past actions and continuing conduct in perpetrating the fraud on plaintiffs, also demonstrates a "pattern of racketeering activity" in that it constitutes an "open period" which the Court defines as "past conduct that by its nature projects into the

future with a threat of repetition." *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. at 241, 109 S.Ct. at 2902. The Myers Defendants' predicate criminal acts emerge as "a regular way of conducting" defendants' business and the Enterprise. 492 U.S. at 242, 109 S.Ct. at 2902. The Myers Defendants also continue to pursue their fraudulent partnership and real estate transactions as a regular course of business. *E.g., Amsler v. Corwin Petroleum Corp.*, 715 F.Supp. 103, 104–05 (S.D.N.Y. 1989) (upholding claim based on sale of one oil well when showing was made that defendants made such sales "on a continuing basis").

(8) Plaintiffs were proximately injured in their business or property by reason of the Myers Defendants' violation of 18 U.S.C. § 1962.

### C. Securities Fraud.

The sale to plaintiffs of limited partnership interests in the three limited partnerships in issue constitute the sale of securities in connection with Myers' fraudulent scheme, in violation of Section 10(b) of the Exchange Act and Rule 10b–5 thereunder. Plaintiffs, who had no experience with the buying and selling of raw land, intended by their purchase of limited partnership interests to provide the capital for the ventures. The conduct of the ventures was left in the hands of Myers who had represented himself as especially gifted at identifying valuable land which could be bought below market and resold at a substantial profit in a short period of time. Myers would provide all the effort required to make the ventures profitable. Plaintiffs provided the money and were passive investors. In short, plaintiffs relied entirely on Myers to make the venture profitable.

Plaintiffs' limited partnership interests were "securities" for purpose of Section 10(b) of the Exchange Act as investment contracts. 15 U.S.C. § 78c(a)(10). In *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946), the Court explained that an investment contract "means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party...." The Court's description of an "investment contract" describes the limited partnership interests which plaintiffs in this case bought from Myers.

The Court of Appeals for the Second Circuit, following the *Howey* standard, has held that a "limited partnership interest generally is a security because such an interest involves investment 'in a common enterprise with profits to come solely from the efforts of others.'" *Mayer v. Oil Field Sys. Corp.*, 721 F.2d 59, 65 (2d Cir. 1983) (quoting *SEC v. W.J. Howey Co.*, 328 U.S. at 301, 66 S.Ct. at 1104).

The facts which plaintiffs established proved a fraudulent scheme by the Myers Defendants in connection with the sale of limited partnership interests in the three land investment limited partnerships in this case. The Myers Defendants, directly or indirectly, by the use of instrumentalities of interstate commerce or of the mails, employed devices, schemes or artifices to defraud, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made not misleading. The Myers Defendants also engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon plaintiffs in connection with the purchase or sale of securities. Such actions are violations of Section 10(b) of the Exchange Act and Rule 10b–5 thereunder.

### D. Myers' Common Law Fraud.

"The essential elements of the injured party's cause of action [for fraud] are 'representation of a material existing fact, falsity, scienter, deception and injury.'" *DiRose v. PK Management Corp.*, 691 F.2d 628, 630 (2d Cir.1982), *cert. denied*, 461 U.S. 915, 103 S.Ct. 1896, 77 L.Ed.2d 285 (1983) (citing *Channel Master Corp. v. Aluminum Ltd. Sales*, 4 N.Y.2d 403, 407, 151 N.E.2d 833, 835, 176 N.Y.S.2d 259, 262 (1958)); *Aries Ventures, Ltd. v. Axa Finance S.A.*, 729 F.Supp. 289, 299 (S.D.N.Y. 1990).

Myers' representations to plaintiffs that he would not obtain for himself any benefit

from the purchase of land for the Limited Partnerships were fraudulent because Myers did not intend to abide by his representations. A person who induces another to enter a contract by making a representation of future conduct which he has no intention of fulfilling is liable in damages for fraud. *DiRose v. PK Management Corp.*, 691 F.2d at 630; *Aries Ventures, Ltd. v. Axa Finance S.A.*, 729 F.Supp. at 298 ("New York recognizes a cause of action for fraud in the inducement of a contract which is distinct from a claim that the defendant failed to perform the contractual obligations themselves."); *Cauble v. Mabon Nugent & Co.*, 594 F.Supp. 985, 993 (S.D.N.Y.1984); *Channel Master Corp. v. Aluminum Ltd. Sales*, 4 N.Y.2d at 406–08, 151 N.E.2d at 835–36, 176 N.Y.S.2d at 261–63; *see also,* Restatement (Second) of Torts § 530 (1977). Plaintiffs have proven the elements of falsity, scienter, deception and injury. *See* Conclusions of Law, *supra.*

 Myers' false statements are also actionable as constructive fraud since the parties were in a relationship of trust and confidence, *Brown v. Lockwood*, 76 A.D.2d 721, 432 N.Y.S.2d 186, 195 (2d Dep't 1980), or where the statements were made as part of a larger fraudulent scheme. *See, e.g., In re Garver*, 26 Bankr. 552, 555 (Bankr. Vt.1983).

### E. The Myers Defendants' Breach of Fiduciary Duty.

 The three limited partnership agreements entered into by the Myers Defendants and plaintiffs established a fiduciary relationship between the parties. The Myers Defendants breached their fiduciary duties to plaintiffs through their fraudulent scheme in conducting the affairs of the three limited partnerships. Myers and Myers Financial were general partners who secretly converted for their own use and diverted for non-partnership purposes monies obtained from plaintiffs which were partnership property.

Many years ago, Chief Judge Cardozo of the New York Court of Appeals condemned a managing partner's appropriation for himself of a partnership asset, writing that a partner owed his co-partners a duty of "the finest loyalty.... Not honesty alone, but the punctilio of an honor the most sensitive, is ... the standard of behavior." *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928).

That duty described by Chief Judge Cardozo was the duty which Myers owed to the plaintiff limited partners here. *Lichtyger v. Franchard Corp.*, 18 N.Y.2d 528, 536, 223 N.E.2d 869, 873, 277 N.Y.S.2d 377, 383 (1966) ("There is no basis or warrant for distinguishing the fiduciary relationship of corporate director and shareholder from that of general partner and limited partner"); *Riviera Congress Assocs. v. Yassky*, 18 N.Y.2d 540, 547, 223 N.E.2d 876, 879, 277 N.Y.S.2d 386, 392 (1966) ("There can be no question that a managing or general partner of a limited partnership is bound in a fiduciary relationship with the limited partners"); *Dymm v. Cahill*, 730 F.Supp. 1245, 1264 (S.D.N.Y.1990); *Grierson v. Parker Energy Partners 1984–I*, 737 S.W.2d 375, 377 (Tex.App. Houston 1987) ("general partner owes a fiduciary duty to the limited partners to act in accordance with the partnership agreement and not to misapply funds"); *Crenshaw v. Swenson*, 611 S.W.2d 886, 890 (Tex.Civ.App. Austin 1980) ("It is axiomatic that a managing partner in a general partnership, owes his co-partners the highest fiduciary duty recognized in the law.... In a limited partnership, the general partner acting in complete control stands in the same fiduciary capacity to the limited partners as a trustee stands to the beneficiaries of the trust" [citation omitted]).

 It is fundamental that a general partner breaches his fiduciary duty to limited partners when he uses or obtains the benefit of partnership credit or assets for himself without the consent of the limited partners. *Masterson v. Valley Nat'l Bank*, 70 Misc.2d 623, 625, 334 N.Y.S.2d 356, 359 (Sup.Ct. Nassau Co.1972) (citing *Union Nat'l Bank v. Underhill*, 102 N.Y. 336, 340, 7 N.E. 293, 294 (1886); *Mason v. Public Nat'l Bank & Trust Co.*, 262 A.D. 249, 254, 28 N.Y.S.2d 416, 421 (1st Dep't 1941), *aff'd,* 287 N.Y. 809, 41 N.E.2d 91 (1942)). As the court said in *Sandler v.*

*Fishman,* 157 A.D.2d 708, 549 N.Y.S.2d 808, 810 (2d Dep't 1990),

> The Supreme Court also properly determined that the appellants-respondents' secret formation of M & F Associates, and their secret use of $110,000 of partnership funds to provide leased space to Commons ... constituted a breach of their duties as partners and effective managing partners of C.B. Associates....

Moreover, the limited partnership agreements in this case explicitly address the issue of the Myers Defendants' entitlement to fees. The Durham and Sacramento Limited Partnership Agreements provide in Section 3.3 ("Expenses of Partnership") that "[t]he General Partner may not charge the Partnership for any services performed by the General Partner or an affiliate of the General Partner...." The Durham and Sacramento Limited Partnership Agreements also provide in Section 3.7 ("Compensation of Partners") that "[n]o Partner shall receive any compensation or salary for services to the Partnership." Similarly, the Chicago Limited Partnership Agreement provides in Section 2.3 ("Use of Capital") that "all capital contributed to the Partnership shall be used and employed in and about the business and for the benefit and advantage of the Partnership and for no other purpose whatsoever." Section 3.7 ("Compensation of Partners") of the Chicago Limited Partnership Agreement provides that "[n]o partner shall receive any compensation or salary for services due the Partnership." The only compensation which Myers Financial was allowed under the Chicago Limited Partnership Agreement was the expenses set forth in Section 3.3 ("Expenses of Partnership"): an annual partnership fee of $13,000 and an annual land management fee of $52,000. Myers Financial had to obtain the approval of the limited partners for expenses over $65,000 a year. There is no provision in the Chicago Limited Partnership agreement which allows Myers Financial a commission on the purchase of the Partnership's land. Thus, the Myers Defendants' actions in taking funds from the limited partnerships, without the consent of the limited partner

plaintiffs, constituted a breach of the Myers Defendants' fiduciary duties.

Myers also violated his fiduciary duties by failing to make mortgage payments on the mortgage of the Durham Parcel which would have led to a non-curable default causing the entire mortgage debt (approximately $500,000) to be immediately due and payable had the limited partner not made the payment. Myers also failed to make tax payments on the Durham Parcel and failed to pay water assessments for two years. These failures by Myers were in violation of his duties under the Durham Limited Partnership Agreement (Plf.Ex. 1, Section 3.1(d)), under which the general partner had the duty to pay all claims against the Limited Partnership, including tax assessments. The Myers Defendants also breached their fiduciary duties by failing to advise the limited partners of offers to buy the Durham and Chicago Parcels, by blocking the sale of the Sacramento Parcel and by abdicating their responsibilities as general partner without consent of the limited partner by delegating their general partner duties to Landvest.

■ The burden was on the Myers Defendants to demonstrate that they fulfilled their fiduciary duties to plaintiffs. Once it is shown that a general partner, like Myers and Myers Financial here, has obtained the benefit of partnership assets, it is the general partner's burden to demonstrate that he did not violate his fiduciary duty. *Gordon v. Bialystoker Center and Bikur Cholim, Inc.,* 45 N.Y.2d 692, 699, 385 N.E.2d 285, 288–89, 412 N.Y.S.2d 593, 597 (1978). Myers and Myers Financial failed to carry that burden.

The court notes that plaintiffs' breach of contract claims are based on the same facts and circumstances and allege the same breaches of the limited partnership agreements as their breach of fiduciary duty claims. Thus, the court bases its holdings on the fiduciary duty claims and ignores the duplicative contract claims.

F. Removal of Myers and Myers Financial as General Partners.

■ This Court has the power to remove Myers and Myers Financial as gen-

eral partners of the Limited Partnerships in issue and elevate a limited partner to the position of managing partner in order to preserve the partnership and to stop the fraud. *Homburger v. Levitin*, 130 A.D.2d 715, 718, 515 N.Y.S.2d 825, 827–28 (2d Dep't 1987), *appeal dismissed without op.*, 70 N.Y.2d 795, 516 N.E.2d 1225, 522 N.Y.S.2d 112 (1987). Additionally, both the Durham and Sacramento Limited Partnership Agreements expressly provide (§ 5.4) for the removal of the general partner for his "failure to comply with the terms" of the Partnership Agreement.

In this case, the general partners, Myers and Myers Financial, have demonstrated their consistent disregard for the interests of the limited partnerships and the limited partners. They have conducted the affairs of the limited partnerships for their own benefit and engaged in self-dealing. Myers secretly obtained $230,000 of Durham Limited Partnership funds for his own benefit in connection with the Kent Land Option transaction. Myers obtained the benefit of $114,425.50 in connection with the purchase of the Sacramento Parcel when another limited partnership in which he had a financial interest, Stanford–Placer County Industrial Park Limited Partnership, obtained a reduction in the price it paid for land at the expense of the Sacramento Limited Partnership. Myers took a $308,000 commission in connection with the purchase of the Chicago Parcel in contravention of his representations to plaintiffs' representative that he would take no commission. Myers secretly failed to make his $32,828 capital contribution to the Chicago Limited Partnership. Myers secretly absconded with $108,000 of Chicago Limited Partnership funds. And Myers has improperly charged the Chicago Limited Partnership with $236,000 of expenses. Myers failed to make timely mortgage, tax and water assessment payments for the Durham Parcel. Myers wrongfully blocked the sale of the Sacramento Parcel. Myers has refused to provide financial information for the limited partner of the Sacramento Limited Partnership.

Under all these circumstances, removal of Myers and Myers Financial as general partners is warranted in this case for their failure to deal in good faith and fairly with the limited partnerships and the limited partners. *Curley v. Brignoli Curley & Roberts Assocs.*, 746 F.Supp. 1208, 1221 (S.D.N.Y.1989), *aff'd*, 915 F.2d 81 (2d Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1430, 113 L.Ed.2d 484 (1991).

Defendants argue that the court does not have jurisdiction to remove Myers Financial as general partner of the Chicago Limited Partnership because the Mehtas, the 65% limited partners, are not a party to this lawsuit. However, plaintiff Miltland Chicago–Santa Fe brought a derivative claim seeking Myers Financial's removal on behalf of the partnership (Amended Complaint, Eighteenth Claim). Thus, the court may remove Myers Financial as general partner pursuant to the court's inherent powers. *Curley v. Brignoli Curley & Roberts Assocs.*, 746 F.Supp. at 1219–21; *see Goodwin v. Mac Resources, Inc.*, 149 A.D.2d 666, 667, 540 N.Y.S.2d 477, 478 (2d Dep't 1989).

### G. Liability for the Fraud of His Agent Mudie.

At trial, it was undisputed that Mudie put up the $5,000 earnest money deposit when Redwood and Pettigrew bought the Durham Parcel from Thelma Wynne in August 1984. Mudie had an undisclosed 25% equity interest in the Durham Parcel. Mudie shared with Pettigrew and Redwood the profits of the sale of the Durham Parcel to the Durham Limited Partnership.

At trial, the evidence showed that Mudie committed a fraud on plaintiffs. Mudie was represented to plaintiffs as acting on their behalf. Stark testified, without dispute from Myers, that Mudie was represented to be Myers' agent in the purchase of the Durham Parcel. As such, Mudie owed a fiduciary duty to Miltland Raleigh–Durham. Mudie committed fraud and breached that duty by his non-disclosure of his 25% equity interest in the Durham Parcel.

In *Sanders v. Spaulding & Perkins, Ltd.*, 82 N.C.App. 680, 681, 347 S.E.2d 866, 867 (1986), a broker selling property to

plaintiffs failed to disclose his ownership interest in the property. The Court held he had committed fraud on the purchasers by failing to "fully account for the equity proceeds received from the sale". *Id.* In this case, Mudie received at least $153,962 from the sale of the Durham Parcel to the Durham Limited Partnership. As Mudie's principal, Myers is liable for Mudie's fraud committed in the course of his agency. *Citibank, N.A. v. Nyland (CF8) Ltd.*, 878 F.2d 620, 624 (2d Cir.1989); *see also* Restatement (Second) of Agency § 261 (1958).

H. Myers is Not Relieved from Liability Because He Entered Into Business Dealings With His Lawyers.

 Myers argues that he cannot be liable for fraudulent conduct because the majority of investors in the plaintiff investment partnerships were also attorneys at Milbank which had done legal work for him on an initial public offering on another venture. One partner, Blattmachr, was also doing estate work for him. Myers argues that this created a conflict of interest which relieves him of liability for his own fraud and breach of fiduciary duty.

Myers has failed to prove a factual basis for his argument. The plaintiff investment partnerships which are asserting claims against Myers are distinct entities from Milbank. While many members of the plaintiff partnerships are also attorneys with Milbank, some members of the plaintiff partnerships are not.

The uncontested evidence at trial established that Milbank did not act as counsel for Myers in the transactions at issue. Stark testified that Myers was expressly told that Milbank could not act as his lawyers in connection with these transactions, that Myers had to retain other counsel and that Myers expressly acknowledged that he understood that statement. In his testimony at trial, Myers did not contest the foregoing facts. Milbank did not act as Myers counsel; therefore, there was no conflict of interest.

The uncontested evidence at trial also established that Myers in fact did have other counsel in the transactions at issue. Three witnesses, Stark, Ashton–Blair and Spielberg, testified that Myers had his own

lawyers working on the Durham and Sacramento transactions. Myers himself wrote to Nelson (Plf.Ex. 54) that "Jay Vogelson in our Dallas law firm" was going to review the Chicago Limited Partnership Agreement "to insure that the agreement which we are using for the purposes of closing the transaction with Milbank, Tweed and U.S. Trust is satisfactory to both of you." Although Myers testified for the better part of three days, he never contradicted the testimony of Stark, Ashton–Blair and Spielberg that Myers had his own counsel on the transactions. Three days before the trial began, Myers' counsel wrote plaintiffs' counsel admitting that Jay Vogelson had been Myers' counsel during the relevant period (Plf.Ex. 259).

A client cannot urge that he can defraud his lawyer just because the two enter into a business relationship. That was recognized in *Greene v. Greene*, 56 N.Y.2d 86, 92, 436 N.E.2d 496, 499, 451 N.Y.S.2d 46, 49 (1982). This is not a case, as in *Greene*, of a lawyer obtaining an unwarranted benefit from a transaction with his client in which the client did not have independent counsel. It is undisputed that it was plaintiffs who put up 99% of the capital for the three limited partnerships at issue. Plaintiffs are not accused of taking Myers' money; plaintiffs' funds were taken by Myers. Myers, not plaintiffs, was the knowledgeable person. Myers was the real estate expert; plaintiffs were the investors. Myers may not defend his actions by urging that plaintiffs are barred from recovery because there was a lawyer-client relationship on matters other than the transactions at issue here.

In arguing that Milbank, as Myers' retained counsel on other matters, breached its fiduciary duty to him, defendants misstate holdings in *Rode v. Branca*, 481 F.Supp. 808 (E.D.N.Y.1979) (does not hold that non-attorney must have independent counsel in transaction with attorney); *Shaw v. Manufacturers Hanover Trust Co.*, 68 N.Y.2d 172, 499 N.E.2d 864, 507 N.Y.S.2d 610 (1986) (does not stand for the proposition that the fact that Myers had his own counsel here is immaterial; the issue was not even raised in *Shaw* since the

**1062**

client did not have separate counsel); and *In re James*, 452 A.2d 163 (D.C.App.1982), *cert. denied*, 460 U.S. 1038, 103 S.Ct. 1429, 75 L.Ed.2d 789 (1983) (does not require that advice to obtain separate counsel must be in writing).

It is true that Myers, as a client of Milbank, confided on other matters with some Milbank attorneys who later became plaintiff limited partners. However, the court sees no basis to conclude that any Milbank attorney put any of the confidences to an unreasonable use, acted with fraudulent intent, or behaved unethically with respect to any of the matters raised in this lawsuit. *See Rode v. Branca*, 481 F.Supp. 808, 811 (E.D.N.Y.1979).

I. Punitive Damages.

■ In this case arising, *inter alia*, under the Federal securities laws, this court has jurisdiction to award punitive damages on plaintiffs' pendant state law claims. *Aldrich v. Thomson McKinnon Sec., Inc.*, 756 F.2d 243, 246–47 n. 3 (2d Cir.1985). Thus, under Texas law, which governs the Durham and Sacramento Limited Partnerships, the court may consider punitive damage awards on plaintiffs' common law fraud and breach of fiduciary duty claims. *Boelens v. Redman Homes, Inc.*, 748 F.2d 1058, 1070 (5th Cir.1984) (punitive damages properly allowed in tort actions); *Murphy v. Canion*, 797 S.W.2d 944, 949 (Tex.App. Houston 1990) (exemplary or punitive damages are proper when a fiduciary has engaged in self-dealing).

"The purpose of punitive damages is to punish defendant for his wilful or malicious conduct and to deter others from similar behavior." *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 306 n. 9, 106 S.Ct. 2537, 2543 n. 9, 91 L.Ed.2d 249 (1986). "If the damage award is to serve its intended objective of punishment for wrongful conduct and deterrence against repetition of a like offense, it must be sufficient to 'smart' the offender which permits a consideration of the wealth of the malefactor." *Brink's, Inc. v. City of New York*, 546 F.Supp. 403, 413 (S.D.N.Y.1982) (Weinfeld, J.), *aff'd*, 717 F.2d 700 (2d Cir. 1983); *Schoenholtz v. Doniger*, 657 F.Supp. 899, 916 (S.D.N.Y.1987) (court

must consider "the relative wealth of the particular defendants," among other things, in determining amount of punitive damages).

The court finds that punitive damages are appropriate in this case. Myers' dealings with plaintiffs were marked by his total contempt for honesty and fair dealing, which was compounded by his flagrant disregard for truth in this court. In order to determine the appropriate quantum of punitive damages, the court requires an evidentiary hearing, at which time the parties will be permitted to present any relevant evidence on the quantum of punitive damages. The hearing will not be an opportunity to relitigate the threshold question of the Myers Defendants' liability for punitive damages.

J. Attorney's Fees.

In addition to RICO's provision requiring the award of attorney's fees, 18 U.S.C. § 1964(c), plaintiffs are entitled to their attorney's fees based on the following authorities.

■ (1) This court has inherent equitable powers to award attorney's fees when the interests of justice so require. *Hall v. Cole*, 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973) ("a federal court may award counsel fees to a successful party when his opponent has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.' ").

■ (2) New York law provides that a fiduciary is liable for attorney's fees and other expenses incurred by an estate in exposing a trustee's misconduct. *Birnbaum v. Birnbaum*, 157 A.D.2d 177, 191, 555 N.Y.S.2d 982, 991 (4th Dep't 1990). *See also, Public Service Co. v. Chase Manhattan Bank, N.A.*, 577 F.Supp. 92, 110 (S.D.N.Y.1983) (under New York law, attorney's fees have been assessed not only against trustees who have engaged in self-dealing, but against negligent trustees).

(3) The Texas Revised Limited Partnership Act, Tex.Rev.Civ.Stat. art. 6132a–1, § 11.01 (1992) (governing the Durham and Sacramento Limited Partnerships) and the

Illinois Revised Uniform Limited Partnership Act, Ill.Rev.Stat. ch. 106–½, ¶ 160–4 (1991) (governing the Chicago Limited Partnerships) provide for the award of attorney's fees in successful derivative actions.

Plaintiffs are directed to file an affidavit with respect to the quantum of their attorney's fees. There will then be a hearing as to same.

## V. Conclusion

Plaintiffs are entitled to the following monetary awards.

(1) Plaintiff Miltland Raleigh–Durham will be awarded judgment against Myers in the amount of $383,962, which is composed of $230,000 from the purchase of the Kent Land Option and $153,962 from Mudie's fraudulent receipt on his undisclosed interest in the Durham Parcel;

(2) Plaintiff Miltland Sacramento will be awarded judgment against Myers in the amount of $114,425.50 for damages suffered in connection with the Sacramento transaction;

(3) Because the Chicago Limited Partnership should have judgment in the amount of $308,014.92 as a result of the commission which Myers fraudulently obtained on the purchase of the Chicago Parcel, plaintiff Miltland Chicago–Santa Fe will be awarded judgment against Myers in the amount of $104,725.07 as its 34% share of the $308,014.92 commission;

(4) Because the Chicago Limited Partnership should have judgment in the amount of $108,569 as a result of the Myers Defendants' fraud and breach of fiduciary duty in their diversion of partnership funds, Miltland Chicago–Santa Fe will be awarded judgment against the Myers Defendants in the amount of $36,913.46 as its 34% share of the $108,569 in diverted funds;

(5) Because the Chicago Limited Partnership should have judgment in the amount of $32,828 for the wrongful failure of Myers Financial to make a contribution in that amount, Miltland Chicago–Santa Fe will be awarded judgment against the Myers Defendants in the amount of $11,-168.32 as its 34% share of the $32,828 which Myers Financial failed to contribute.

(6) Because the Chicago Limited Partnership should have judgment in the amount of $236,000 for the Myers Defendants' wrongful charges relating to the Grant Suit—namely, $145,000 in settlement costs, $50,000 in consulting fees to Heritage and $41,000 in legal fees to Golub—where such charges to the partnership were solely for the benefit of the Myers Defendants, Miltland Chicago–Santa Fe will be awarded judgment against the Myers Defendants in the amount of $80,240 as its 34% share of the $236,000 in wrongful charges.

Plaintiffs are entitled to interest on the foregoing sums. In addition, the foregoing damages are to be trebled under RICO, 18 U.S.C. § 1964(c). Plaintiffs will also be awarded the costs of this action, their attorneys' fees and punitive damages in amounts to be determined.

Plaintiffs are also entitled to their requested equitable relief, including injunction and removal of general partners. Submit order on fifteen days notice from the date of this Opinion.